CARONDELET HEALTH SYSTEM,
INC., Respondent,

v.

ROYAL GARDENS ASSOCIATES,
et al., Appellants.

No. WD 52270.

Missouri Court of Appeals,
Western District.

Submitted Oct. 23, 1996.

Decided Feb. 11, 1997.

Motion for Rehearing and/or Transfer to
Supreme Court Denied April 1, 1997.

Application to Transfer Denied
May 27, 1997.

Thomas M. Franklin, Kansas City, for appellants.

Spencer J. Brown, Kansas City, for respondent.

Before SMART, P.J.,and SPINDEN and ELLIS, JJ.

SMART, Presiding Judge.

Royal Gardens Associates ("RGA"), a Missouri general partnership, and its current partners appeal from the trial court's action in granting summary judgment in favor of Carondelet Health System, Inc. ("CHS") requiring that RGA specifically perform a contract to sell St. Mary's Manor, a nursing home in Blue Springs, to CHS. RGA contends that the trial court erred in granting the motion for summary judgment because

CHS failed to establish that there was no genuine dispute about any material facts related to an arbitration award in that (1) the arbitration clause did not include provisions necessary for enforcement and (2) there was a genuine dispute concerning the intent to submit issues of contract interpretation to the appraisers. RGA also argues that CHS failed to establish the essential elements for specific performance because the option price of St. Mary's Manor remained disputed. CHS has filed a motion in this court, taken with the case, asking that part of the record be stricken. That motion is denied. The judgment of the trial court is affirmed.

CHS is a not-for-profit charitable Missouri corporation with its principal place of business in St. Louis, Missouri. It controls a system of charitable hospitals, nursing homes and related health care facilities, including facilities in Blue Springs, Missouri and Kansas City, Missouri. RGA is a Missouri general partnership which owns St. Mary's Manor, a nursing home in Blue Springs.

On May 29, 1986, RGA entered into an option agreement with the Sisters of St. Mary ("SSM"). The agreement gave SSM "the right and option to purchase such real property, along with all improvements thereon and other assets of the Partnership utilized in connection with the operation of the Facility [St. Mary's Manor]...." The agreement provided that the option could be exercised "at any time after July 1, 1992" and that the option would expire after July 1, 1994. The agreement also provided that SSM could assign its rights under the agreement with the consent of RGA. On December 31, 1993, SSM assigned its interest in the option agreement to CHS. RGA consented to the assignment. CHS exercised the option on April 5, 1994.

The agreement provided that, at closing, RGA was to deliver title that was "marketable in fact, free and clear of any liens, assessments and encumbrances...." The agreement also provided that CHS could "elect to purchase the Premises subject to existing debt provided that releases are obtained for all personal guarantors of such debt." CHS chose not to assume the debt.

The option agreement contained detailed provisions for the determination of a purchase price. The agreement provided that in the event that the option was exercised under section 2.1.1 of the option agreement (as it was in the instant case) "the purchase price to be paid by SSM for the Premises would be an amount equal to the amount determined under Section 4.3, less $750,-000.00." Section 4.3 contained provisions for determining the purchase price. It provided:

4.3 *Amount.* The amount determined under this Section 4.3 shall be the lesser of:

(i) the fair market value as determined either by agreement of the parties or, if the parties are unable to agree, by appraisal (as described in Section 4.4), or

(ii) if the exercise of the option occurs on or before July 1, 1994, the adjusted cost of the Improvements determined as provided herein, plus the adjusted cost of Personal Property on the books of Partnership as of the date of exercise of the option determined as provided herein....

4.4 *Purchase Under Section 2.1.4.* In the event of any purchase pursuant to the exercise of an option described in Section 2.1.4, the purchase price to be paid by SSM for the Premises would be the amount of Partnership's obligations outstanding and secured by the Premises, less the Adjusted Amount described at Section 4.8 hereof. Payment shall be as described at Section 5.

Section 4.5 contained the appraisal mechanism:

4.5 *Appraisal.* For purposes hereof, the term "appraisal" shall mean the average fair market value of the Premises as determined by three (3) independent appraisers, each of whom is a member of the Missouri Appraisers Institute (M.A.I.) or is otherwise acceptable to all of the parties hereto. The Partnership and SSM shall each select an appraiser within ten (10) days of the exercise of any option hereunder and said appraisers shall select a third appraiser within ten (10) days of their selection. Each appraiser shall submit to SSM his determination of fair market value of the Premises within thirty (30) days

of the selection of the third appraiser. The purchase price shall be the average of the appraisals. Any determination not received by SSM within fifty (50) days of exercise of the option shall be disregarded in determining fair market value. Costs of an appraisal shall be divided equally between Partnership and SSM.

Before CHS exercised the option, it entered into discussions with RGA concerning the purchase price. No agreement was reached. CHS engaged the accounting firm of Ernst & Young to calculate the adjusted cost price of the property. Ernst & Young determined the adjusted cost price to be $6,000,033.00. RGA disagreed with Ernst & Young's calculations, contending that the adjusted cost price should be approximately $6.8 million. In calculating its price, RGA did not deduct the $750,000.00 referred to in the option agreement. CHS made it clear that it would not agree to amend the agreement to arbitrate the issue of the $750,000.00 deduction because it anticipated "difficulty and delay in negotiating a mutually acceptable arbitration provision when the clear language of Section 4.1 of the Option Agreement (which requires the subtraction of $750,-000.00 from the lesser of the formula option amount and fair market value) is being disputed by you."

In accordance with the option agreement, three M.A.I. appraisers were selected to determine the fair market value of the property. CHS selected Thomas M. Rule. RGA selected Gerald R. Maier. Rule and Maier then selected a third appraiser, David Craig. The three men viewed the premises together and shared information as they worked. Each of the three men was provided a copy of the option agreement. Each of the three men appraised the fee simple interest in St. Mary's Manor. Because he was asked to do so by RGA, Maier also did an investment value analysis of St. Mary's Manor, developing a figure for the market value of the property as enhanced by below-market financing. Each of the three appraisers arrived at a different fee simple value for St. Mary's Manor. This fee simple valuation did not include the financing on the property. Rule valued the fee simple at $5,600,000.00.

Maier valued the fee simple at $7,250,000.00. Craig appraised the fee simple value of the property at $6,000,000.00. From these figures, following the formula provided in the option agreement, the fair market value of the property is easily calculated: [ ($5,600,-000.00 + $7,250,000.00 + $6,000,000.00) ÷ 3]—$750,000.00 = $5,533,334.00. Since $5,533,334.00 is less than $6,000,000.00 or $6,800,000.00, the adjusted cost price, the sum of $5,533,334.00 is the operative purchase price under the option agreement.

CHS appeared at Stewart Title Company at 10:00 a.m. on June 1, 1994, the scheduled time and date of the closing. It tendered the full purchase price of $5,533,334.00. RGA did not appear at the closing and refused to accept the tender made by CHS.

CHS filed a first amended petition in two counts. In Count I, CHS asked for confirmation of the appraiser's determination of the sale price of St. Mary's Manor as an arbitrator's award. Count II asked the court for specific performance of the option agreement. RGA counterclaimed. It sought a declaration of the rights of the parties under the option agreement. CHS filed a motion for summary judgment on its petition. The trial court granted the motion, finding that the purchase price of St. Mary's Manor is $5,533,334.00. The court also ruled that since St. Mary's Manor is unique, CHS had no adequate remedy at law. Therefore, the court ordered specific performance of the option agreement. RGA appeals.

## SUMMARY JUDGMENT

Appellate review of summary judgments is, in essence, *de novo*. *Rice v. Hodapp*, 919 S.W.2d 240, 243 (Mo. banc 1996). We review the record in the light most favorable to the party against whom the judgment was entered. *ITT Commercial Fin. Corp. v. Mid–America Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo. banc 1993). The party who moves for summary judgment has the burden of establishing that it is entitled to judgment as a matter of law. *Id.* at 382. Evidence in the record that presents a genuine issue of material fact will defeat a movant's right to summary judgment. *Id.* A genuine issue "implies that the issue, or dispute, must

be a real and substantial one—one consisting not merely of conjecture, theory and possibilities." *Id.* at 378. In other words, the dispute must not be simply argumentative, frivolous or imaginary. *Id.* at 382. If the trial court's grant of summary judgment is sustainable on any theory as a matter of law, then we must sustain that grant. *Preston v. Preston*, 823 S.W.2d 48, 49 (Mo.App.1991).

## THE OPTION AGREEMENT

RGA contends that the trial court erred in granting summary judgment because there is a genuine dispute about an essential element for enforcement of an arbitration award in that (1) the arbitration clause did not include provisions necessary for enforcement and (2) there was a genuine dispute concerning the intent to submit issues of contract interpretation to the appraisers. The parties approach this case as though it involves issues arising under the law relating to arbitrations. They address whether the mechanism for appraisal in the option agreement constitutes a binding arbitration provision. However, in our view, this is not a case involving an arbitration award; it is a contract case. The use of an appraisal framework is not the same thing as an agreement for arbitration. *See Sholz v. Mills*, 176 Mo.App. 352, 158 S.W. 696 (1913)(provision for appraisal is technically not an arbitration and not governed by rules applicable to arbitration). We believe the issue is properly resolved under standard contract provisions. We hold that the trial court correctly ruled that the option agreement is specifically enforceable.

■ In an action for specific performance, the right to sue is triggered by the failure of a party to do that which is contracted for, in accordance with the procedure established by the contract. *Hart v. Dick*, 570 S.W.2d 820, 822 (Mo.App.1978). If an option contract contains the necessary provisions, specific performance may be enforced. *Dean Operations, Inc. v. Pink Hill Assocs.*, 678 S.W.2d 897, 900 (Mo.App.1984). The five essential contract provisions are: (1) the parties to the contract; (2) the subject matter; (3) the promises made by both sides; (4) the price; and (5) consideration. *Id.* The court

in *Frey v. Yust*, 516 S.W.2d 321, 323 (Mo. App.1974), explains:

> An option is a privilege, a right of election to exercise a privilege. As such, an option constitutes a continuing offer on the part of the vendor or owner until accepted within the time and on the terms limited in the option. When accepted, a valid agreement arises supported by mutual promises. Stated more specifically, when the offer is seasonably accepted, a new bilateral contract arises, and it is this contract which is specifically enforceable.

**(Citations omitted).**

RGA and CHS were parties to an option agreement. The agreement was seasonably exercised by CHS. The agreement provided detailed and unambiguous instructions for determining a price. CHS tendered the purchase price but RGA failed to accept that tender and perform its end of the agreement.

RGA explains in detail that it should not be held to the clear terms of the contract and that the contract really meant that the option would not be exercised unless necessary to break a deadlock in the management of the nursing home. RGA also details its disagreement with the pricing mechanism outlined in the agreement. It intends that CHS should be forced to include the value of the bond financing in the price. None of RGA's claims are pertinent to the issue at hand: whether the option agreement can be specifically enforced in view of the fact that the contract is unambiguous. Indeed, RGA's position is in conflict with the clear and unambiguous language of the agreement itself.

■ "The cardinal rule in the interpretation of a contract is to ascertain the intention of the parties and to give effect to that intention." *J.E. Hathman, Inc. v. Sigma Alpha Epsilon Club*, 491 S.W.2d 261, 264 (Mo. banc 1973). Where the contract is unambiguous, intent is ascertained from the contract alone. *Id.* A disagreement by the parties as to the proper interpretation of the contract does not render the contract ambiguous. *Id.* In a contract, an ambiguity arises only where its terms are susceptible to fair and honest differences. *CB Commercial Real Estate Group, Inc. v. Equity Partnerships Corp.*, 917 S.W.2d 641, 646 (Mo.App.

1996). The determination of whether a contract is ambiguous is a question of law and properly decided by the court. *Id.* In the instant case, the contract is not ambiguous. We look to the contract alone in our determination of the intent of the parties.

The option agreement provided definite dates between which the option could be exercised. Section 2.1.1 provided for the exercise of the option, "At any time after the fifth anniversary of the commencement of any services at the Facility, but in all events at any time after July 1, 1992. . . . " Section 2.2 stated that the option "shall expire if not exercised by the earlier of (a) the fifteenth anniversary of commencement of services of the Facility, or (b) the earlier expiration of an option which arose under Section 2.1.4 and 2.1.5 after July 1, 1994." CHS, the assignee of SSM, exercised the option on April 5, 1994.

■ At closing, under Section 10.2 of the agreement, RGA was to deliver title that was "marketable in fact, free and clear of any liens, assessments and encumbrances. . . ." The same section provided that CHS could "elect to purchase the Premises subject to existing debt provided that releases are obtained for all personal guarantors of such debt." CHS elected not to assume the debt. This section is clear; CHS could not be forced into assuming the premises subject to the existing debt. Nothing in the agreement required that the debt be taken into account in the purchase price.

■ Nor is there anything in the elaborate mechanism established for determining a purchase price that would reveal an ambiguity as to whether financing should be included in the appraisals of the property. There are two alternate ways to arrive at a purchase price outlined in the option agreement. Section 4.3 contains provisions for determining the purchase price:

> 4.3 *Amount.* The amount determined under this Section 4.3 shall be the lesser of:
>
> (i) the fair market value as determined either by agreement of the parties or, if

the parties are unable to agree, by appraisal (as described in Section 4.4), or (ii) if the exercise of the option occurs on or before July 1, 1994, the adjusted cost of the Improvements determined as provided herein, plus the adjusted cost of Personal Property on the books of Partnership as of the date of exercise of the option determined as provided herein. . . .

Both methods of arriving at a price described in 4.3(i) and 4.3(ii) were utilized. Nothing in either method provides for valuation of the financing.

Because the parties could not agree upon a price, Section 4.5, the appraisal mechanism, was necessary. It too reveals no ambiguous terms, declaring that the appraisal "shall" be of "average fair market value of the Premises as determined by three (3) independent appraisers, each of whom is a member of the Missouri Appraisers Institute (M.A.I.) or is otherwise acceptable to all of the parties hereto." The purchase price then is established and "shall be the average of the appraisals."

Each of the three appraisers valued the property and submitted a detailed report. Each appraiser valued the fee simple estate without the value of bond financing included. Each of the three appraisers was provided a copy of the option agreement. Maier also did a separate investment value analysis of St. Mary's Manor, the market value of the property as enhanced by below market financing. Rule valued the fee simple, described in his appraisal as "Fee Simple Estate without regard to bond financing" at $5,600,000.00. Maier valued the fee simple at $7,250,000.00. His separate valuation, taking bond financing into consideration, was $8,000,000.00. Craig appraised the fee simple value of the property at $6,000,000.00.

■ RGA's assertion, that there exists a material dispute as to whether there was an agreement to allow the appraisers to decide whether to value bond financing, is misleading. RGA might have wished that bond financing was included in the valuation and might have instructed Maier to include a separate analysis of the value of the bond financing, but this does not make the issue a genuine issue, one which is "real and substantial." *ITT Commercial Fin. Corp.*, 854 S.W.2d at 378. It was not up to the appraisers to decide whether to value the bond financing, and indeed, they did not make any such decision. Rather, it was determined in the option agreement that the valuation would be of the fee simple interest, a term that all three appraisers understood in the same way. It is perfectly acceptable to agree by contract to have third parties decide values. "At common law parties have the right to have losses and values affecting liability under a contract appraised by third persons selected by them." *Dworkin v. Caledonian Ins. Co.*, 285 Mo. 342, 226 S.W. 846, 851 (banc 1920).

Similarly, there is no merit in RGA's assertion that the trial court erred in granting summary judgment to CHS because there was evidence that an additional $750,000.00 was not included in the purchase price. RGA's argument is based upon the value of the property with the inclusion of the bond financing as valued by Maier. The option agreement specifically stated that CHS could elect to assume the premises subject to existing debt. CHS chose not to do so. There is nothing in the agreement which supports RGA's position.

The trial court did not err in granting summary judgment.

Affirmed.

SPINDEN and ELLIS, JJ., concur.