**Donald E. DWYER and William R. Boxdorfer, Plaintiffs/Appellants/ Cross–Respondents,**

v.

**UNIT POWER, INC. Defendant/Respondent/ Cross–Appellant.**

Nos. 71269, 71273.

Missouri Court of Appeals, Eastern District, Division One.

Feb. 17, 1998.

Motion for Rehearing and/or Transfer to Supreme Court Denied April 20, 1998.

Application for Transfer Denied May 26, 1998.

1. The Board's Motion to Dismiss as Moot, filed with this Court on March 27, 1997, is denied.

Richard H. Edwards, Michael R. Young, Clayton, for plaintiffs/appellants/cross-respondents.

Robert J. Selsor, St. Louis, for defendant/respondent/cross-appellant.

GRIMM, Presiding Judge.

In this court-tried case, the two plaintiffs sued defendant corporation for breach of their employment agreements. On the other hand, defendant corporation filed a counterclaim, alleging plaintiffs converted corporate funds to their own use. The trial court entered judgment for plaintiffs on their breach of contract claims. It also found for defendant corporation against plaintiffs on its conversion claim.

All parties appeal. Plaintiffs' sole point alleges the trial court erred in entering judgment on defendant's conversion claim because the money was "not the kind of property subject to conversion." We agree and reverse.

Defendant corporation's sole point alleges the trial court erred as a matter of law in awarding plaintiffs judgment because their "proven dishonesty, both before and after the start of the contracts' term, served as a valid basis for their termination." We agree and reverse.

## I. Background

Defendant's business is the reconditioning and rebuilding of diesel engine parts primarily for the railroad industry. In 1985, plaintiffs and Carlos Madrazo purchased the assets of another corporation and formed defendant corporation. Initially, each plaintiff owned 7,500 shares and Mr. Madrazo owned 20,000 shares. Each plaintiff had the option to purchase an additional 12,500 shares. Plaintiffs' exercised those options and by December 1989, plaintiffs and Mr. Madrazo each owned 20,000 shares.

Plaintiffs approached two Japanese companies who did business with defendant about purchasing stock. In March 1990, plaintiffs each sold 6,600 shares to the companies, Asia Tsusho and Tokyo Iron Works. Mr. Madra-

zo continued to own 20,000 shares, while plaintiffs each owned 13,400 shares. Although there were now five shareholders, the board of directors continued to consist of Mr. Madrazo and the two plaintiffs.

Minutes of the May 29, 1990 board of directors meeting reflect that defendant's option to purchase its building required it to give 60–days written notice before July 1, 1990. The purchase price was $1,200,000. Plaintiff Dwyer indicated that Tokyo Iron had given a verbal commitment to loan the full amount with an interest rate of two or three percent over the Japanese prime rate. The board voted to proceed with the purchase, using the loan from Tokyo Iron.

The minutes further reflect that Mr. Madrazo referred to notes he had made of a June 1988 board meeting. According to him, the board had agreed that officers' salaries would be reduced until corporate monthly profits exceeded $12,000 for two consecutive months. Further, he presented an accountant prepared financial report indicating that the three officers' salaries were reduced for the months of July through October 1988 in accordance with that agreement. However, in November 1988, each plaintiffs' salary was increased to $75,000, while Mr. Madrazo's salary remained at $30,000. Mr. Madrazo noted that the officers' salaries had not been formally increased, and said that any increase should be returned to the company. While acknowledging that no board meeting had occurred, plaintiffs disagreed that Mr. Madrazo's notes were binding and also disagreed that any salary increase should be returned.

In addition, the minutes reflect that Mr. Madrazo expressed "concerns with the way the corporation has been run. [He] indicated that he believed that modifications had been made without his knowledge and that growth opportunities introduced to the corporation regarding the sale of new products had not been explored." A discussion then occurred concerning a possible buy out of Mr. Madrazo's shares. Plaintiff Boxdorfer indicated "he would, in the near future, present Mr. Madrazo with an offer" to purchase his stock.

Late in 1990, Mr. Madrazo sold his shares to the company. Plaintiff Dwyer testified that Mr. Madrazo "wanted out of the company because he did not want to do business with the Japanese." On the other hand, Mr. Madrazo testified that plaintiffs had "assigned themselves incomes that had not been discussed and approved." Further, he said that plaintiffs "admitted to have modified their income … through commissions and sales expenses."

Tokyo Iron Works purchased 16,200 of the shares previously owned by Mr. Madrazo. Each plaintiff purchased 1,900 shares. Thus, in late 1990 and until 1993, Tokyo Iron Works owned 22,800 shares, each plaintiff owned 15,300 shares, and Asia Tsusho owned 6,600 shares.

On June 18, 1991, a special meeting of defendant's board of directors was held. According to the minutes, defendant had received a letter from "Asia Tsusho Co., Ltd., both a Shareholder and creditor of the company." The special meeting was called to address the questions raised in the letter. Among other things, plaintiff Dwyer said that although the corporation was initially profitable, that since 1985, the corporation had lost "approximately $360,000.00, most of the company's net worth."

The next subject addressed was the $1,200,000 loan for the purchase of the building. The promissory note required a $25,000 monthly payment, but a question was raised concerning the "pretense under which the loan was entered into." Plaintiff Boxdorfer replied that in the summer of 1990, "the corporation was optimistic that it could handle a monthly loan payment of $25,000.00." However, "the corporation has been unable to pay down the loan."

Further, the minutes reflect that at the time of the meeting, the defendant corporation owed Asia Tsusho approximately $700,000 for parts and inventory shipped to defendant. Payments for those parts were "running as much as 250 to 260 days behind schedule." In addition, defendant owed Fremont Financial about $215,000 with interest at 5½ % over prime. Plaintiff Boxdorfer said that if Fremont was paid off, "there would be no monies from which to run the company." The representative of Tokyo Iron indi-

cated that he might advance the money to pay off the Fremont loan.

In 1992, plaintiffs began negotiations with Tokyo Iron and Asia Tsusho for the purchase of plaintiffs' shares in defendant corporation. At one time, plaintiffs "were asking over $200,000." Tokyo Iron and Asia Tsusho were not willing to pay that much for the company because it had no net worth and "was bankrupt." Finally, on March 31, 1993, an agreement was reached.

The agreement provided that each plaintiff would sell 5,900 shares to defendant corporation for $295 or five cents a share. Each plaintiff sold his remaining 9,400 shares to Tokyo Iron for $50,000 or approximately $5.32 a share. In addition, each plaintiff signed virtually identical five-year employment agreements with defendant. These agreements provided that each plaintiff would be paid $75,000 annually, plus incentive compensation, to serve as either general manager or sales manager. The corporation had the right to terminate the employment:

> For just cause defined as an Employee's material failure to perform assigned duties, willful failure to carry out the directions of supervisors, or commission of an act of dishonesty relating to his employment.

> Employer may not terminate this Agreement for just cause unless Employer has first given Employee five (5) days prior written notice of termination which sets forth the grounds of termination, and Employee has failed to cure the stated grounds for termination within the five day period; provided, however, Employee may have no more than two (2) opportunities to correct during any twelve (12) month period, commencing upon the effective date of this Agreement.

We digress from the chronology to mention several relevant bank accounts. Early in defendant's history, at the request of Mr. Madrazo, a corporate bank account was established in Texas. Later, also at his request, the account was moved to Texas Capital Bank. It is unclear from the record the extent of its initial use. However, from 1990 until January 1993, there "was very little activity in that account." Defendant corpo-

ration's main account was at Boatmen's in St. Louis.

Obviously, when only Mr. Madrazo and plaintiffs were shareholders, all the shareholders knew of the Texas account. Nothing in the record reflects that either Tokyo Iron or Asia Tsusho had any knowledge of the Texas account until it was mentioned by one of defendant's bookkeepers at a luncheon meeting in December 1992. According to the bookkeeper, she met with representatives of the two Japanese companies. They discussed expenses and "the Texas Capital account." She told them that she had suspicions that "the account was there and that there might be some possible transactions going through it."

Another bank account also existed. This account was titled "Engine Enterprise" and was at a Mercantile Bank in Chesterfield. Plaintiffs testified that Engine Enterprise was a partnership that the two plaintiffs had to broker and sell parts. This account existed at least from 1987 through 1992. Neither Tokyo Iron nor Asia Tsusho knew of this account until a month or two after the employment agreements were signed.

We return to the chronology following the events on March 31, 1993. On April 1, the board of directors instructed its attorney to obtain all financial information concerning the corporation, including the Texas bank account.

Plaintiffs testified that during April the employment agreement was complied with. In May, the defendant corporation did not pay their country club dues. Previously, the defendant corporation had paid those expenses.

During April, May, and June, the board's attorney obtained defendant's financial records, including those of the Texas bank. He observed numerous checks issued in favor of Engine Enterprise.

On July 16, plaintiffs were asked to attend a meeting. In addition to the plaintiffs, representatives of Tokyo Iron and Asia Tsusho were present. At that meeting, which lasted about ten minutes, questions were asked about the Texas account. Plaintiff Boxdorfer

was asked "what Engine Enterprise was" and "who the principals of Engine Enterprise were." Plaintiff Dwyer was asked the same questions. At trial, plaintiff Boxdorfer said he did not recall giving any answer to those questions. Plaintiff Dwyer said "either ... 'I have no response,' or I didn't say anything."

Thereafter, the attorney and one of the companies' representatives left the meeting. About a minute or so later, they returned. At that time, the attorney gave each plaintiff a letter of dismissal. The letters gave plaintiffs five days notice that their employment would be terminated effective July 23, 1993. The letters gave the "just cause" as their "participation in the apparent unlawful interception and conversion of company funds while elected and employed as an officer of the corporation." Further, the letters demanded repayment of all improperly diverted funds.

Later, by agreement, plaintiffs were placed on leave of absence from the corporation beginning July 23, 1993. The "deadline" imposed by the previous termination notices was extended from July 23 until August 23. Further, plaintiffs were given until August 23 to furnish any written explanations or documentation "concerning the cited grounds for termination."

On August 19, plaintiffs' attorney wrote defendant's chief executive officer. In that letter, plaintiffs denied all of the allegations in the July 16 termination letter and stated that any acts complained of occurred at least four months prior to the beginning of the employment agreements and are not "contemplated in nor covered by the Agreement." The letter continued:

> Nevertheless, in the event that some tribunal determines later that said acts were in fact covered by the Agreement, we are hereby tendering to you, pursuant to the provisions of paragraph 8b of the Employment Agreement, our clients' checks totaling $49,220.82. Our clients do not intend by this tender to admit any allegations. Rather, our clients are submitting these sums to you for the purpose of activating the "cure" provisions of the Agreement so that they will not be later foreclosed from

doing so. However, unless this matter can be amicably resolved, our clients intend to seek a refund of these sums at a later date.

On August 24, defendant wrote each of the plaintiffs. Each letter terminated employment as of August 24. The letter pointed out that the checks they tendered were submitted "without any explanation as to how the figure was determined." Defendant did not accept the checks.

Plaintiffs filed their petition in three counts. Count I sought a declaratory judgment that the alleged conversion occurred prior to the beginning of the employment contracts and therefore, as a matter of law, was not in violation of the contracts. Count III sought damages for breach of contract. The petition also contained Count II, which sought an injunction.

Defendant filed a three count counterclaim. It alleged breach of fiduciary duty and conversion, and sought an accounting.

Following a bench trial, the trial court awarded plaintiff Dwyer $763,837.08 on his breach of contract claim and plaintiff Boxdorfer $835,955.03 on his breach of contract claim. It did not award any other relief on plaintiffs' other counts. It also awarded defendant $263,999.19 on its conversion count. The trial court found in favor of plaintiffs on defendant's accounting and breach of fiduciary duty counts.

## II. Plaintiffs' Appeal

In their sole point, plaintiffs' allege the trial court erred in entering judgment against them on defendant's counterclaim for conversion. They contend that "all the evidence indicated that the property allegedly converted was, at best, money held for general corporate purposes, and therefore, not the kind of property subject to conversion." We agree.

■■■ Conversion is the unauthorized assumption of the right of ownership over the personal property of another to the exclusion of the owner's rights. As a general rule, conversion is not the proper remedy to recover on an ordinary debt. Rather, as a general rule, conversion lies only for a specif-

ic chattel which has been wrongfully converted. *Dayton Const., Inc. v. Meinhardt,* 882 S.W.2d 206, 208 (Mo.App. W.D.1994). However, specific checks, drafts, or notes will support a conversion action where they can be described or identified as a specific chattel. *Id.* at 208–09.

Defendant argues that "tens of thousands of dollars of incoming customer payments were intercepted and deposited into the secret Texas Capital Bank account." This argument was supported by substantial evidence. Nevertheless, it does not support a conversion claim.

█ Defendant's theory of conversion is as follows. Checks from the corporation's customers were deposited either into the Texas or St. Louis bank accounts. Some of those funds were then dispersed by the corporation issuing checks to Engine Enterprise. After depositing the checks in the Engine Enterprise account, the funds were paid to plaintiffs by checks signed by one plaintiff and issued to the other.

Defendant introduced many records which support its theory. Some records show that the corporation's ledger account reflects that a check was issued to a specific company, while in fact the check was issued to Engine Enterprise and deposited in its account. However, defendant's theory is flawed because all the funds allegedly converted were drawn on the corporation's own accounts.

The Texas Capital Bank account was apparently established in 1989, and at one time was a regular part of defendant corporation's business. The St. Louis account was the corporation's current general business account. Plaintiffs' brief alleges, and defendant does not contest, that plaintiffs were each authorized to draw on these accounts. Thus, in such circumstances, the rule that conversion will not lie for a general claim for money is applicable. *R.H. Kobusch Furniture & Carpet Co. v. Loewenberg,* 194 Mo. App. 551, 185 S.W. 747, 747–48 (1916).

Defendant argues the funds at issue are specifically identifiable, and thus the exception, not the general rule, is controlling. It cites several cases in support of its argument. We find them all distinguishable.

Defendant first relies on *Dayton Construction.* In *Dayton,* employee deposited customers' checks payable to his employer directly into his separate bank account. The Western District held employee converted the checks because the checks were specifically identified at trial. *Dayton Construction,* 882 S.W.2d at 209. In *Dayton,* the conversion occurred when employee deposited the checks into his own bank account. That bank account was opened by employee and was unknown to anyone else affiliated with employer. *Id.* at 208. The checks at issue were never commingled with employer's funds. In the case before us, the funds at issue were placed into the corporation's accounts, and then allegedly improperly diverted to plaintiffs.

Defendant also relies on *K–Smith Truck Lines, Inc. v. Coffman,* 770 S.W.2d 393 (Mo. App. E.D.1989). In *K–Smith,* employee received checks from employer's customers payable to employer. However, employee failed to deliver the checks to employer. Instead, employee's wife forged employer's endorsement and deposited the checks into employee's and wife's joint bank account. *Id.* at 395. *K–Smith* is easily distinguished because employee never delivered the checks to employer. Again, those funds were never commingled with employer's funds.

Defendant also cites *Lappe & Assoc., Inc. v. Palmen,* 811 S.W.2d 468 (Mo.App. E.D. 1991) and argues a somewhat different theory of conversion. In *Lappe,* a customer gave a stockbroker $18,500 to make a specific stock investment. The stockbroker used the money for other purposes for his personal benefit. This court held since the customer placed the funds in the stockbroker's custody for a specific purpose and the money was diverted for another purpose, a conversion occurred. *Id.* at 471. Those facts are not before us. Here, the funds were no longer specifically identifiable after they were deposited into the corporation's bank accounts.

In the alternative, defendant argues that if the judgment cannot be sustained under a theory of conversion, the trial court's judgment can still be affirmed. It contends that the trial court implicitly found for it on the

breach of fiduciary duty count. Defendant's argument is without merit. In its judgment, the trial court specifically found in plaintiffs' favor and against defendant "on Count I (Breach of Fiduciary Duty) of its Counterclaim."

Plaintiffs' point is granted. We reverse the trial court's judgment in favor of defendant and against plaintiffs on defendant's counterclaim and enter judgment for plaintiffs.

### III. Defendant's Cross Appeal

Defendant's sole point alleges trial court error "in granting a partial summary judgment on plaintiffs' employment contract claims because plaintiffs' proven dishonesty, both before and after the start of the contracts' term, served as a valid basis for their termination." It argues that their "tender of a small portion of the stolen funds could not 'cure' their dishonesty."

While this matter was pending before another circuit judge, plaintiffs filed a motion for summary judgment. In that motion, plaintiffs contended that if they committed any wrongdoings, any such actions occurred prior to March 31, 1993, the date of their employment agreements. Thus, they alleged, "the undisputed facts demonstrate that there was no violation of Plaintiffs' employment contracts, as a matter of law." The summary judgment court agreed. The trial court concurred, ruling "that the alleged dishonesty occurred prior to the effective date of the Employment Agreements and could not be used to justify termination of those agreements."

As stated previously, the employment agreements provided that plaintiffs could be terminated for "just cause." Just cause was defined by the parties in the agreements as:

> an Employee's material failure to perform assigned duties, willful failure to carry out the directions of supervisors, or commission of an act of dishonesty relating to his employment.

The trial court found that the term "employment," as used in the employment agreements "clearly and unequivocally refers to that relationship between the parties that was created by the Employment Agreements and began March 31, 1993." Therefore, since the alleged acts by plaintiffs occurred prior to March 31, 1993, the trial court held defendant breached the contracts by terminating plaintiffs for those acts. We disagree with the trial court's interpretation and its holding.

▇▇▇ Contracts should be interpreted to ascertain the parties' intention and to give that intention effect. Presumptively, the parties' intent is expressed by the natural and ordinary meaning of the words used in the contract. *J.E. Hathman, Inc. v. Sigma Alpha Epsilon Club*, 491 S.W.2d 261, 264 (Mo.banc 1973). Contract terms are ambiguous if they are susceptible to more than one meaning. In the present case, the contract is unambiguous, and therefore we look to the contract alone in determining the parties' intent. *Carondelet Health System, Inc. v. Royal Gardens Associates*, 943 S.W.2d 669, 673 (Mo.App. W.D.1997).

▇▇▇ Our focal point is the clause authorizing termination of the agreements for the "commission of an act of dishonesty relating to his employment." Nothing in the agreement requires that the act of dishonesty occur during the term of the agreement. Had the parties so intended, they could have provided that termination could be for "commission of an act of dishonesty relating to his employment *occurring during the term of this agreement.*" Absent such an express limitation, we decline to ascribe any limitation on the word "employment."

▇▇▇ Moreover, an "interpretation of a contract that creates unreasonable results, when a more probable and reasonable construction can be adopted, will be rejected." *CB Commercial Real Estate Group, Inc. v. Equity Partnerships Corp.*, 917 S.W.2d 641, 647 (Mo. App. W.D.1996). To place a narrow interpretation limiting the "just cause" to acts occurring after March 31, 1993 creates an unreasonable result.

Such a construction could reward dishonest employees who commit numerous dishonest acts and hide them until after an employment agreement is reached. Under that construction, the employer would be obligat-

ed to continue to employ the employee, no matter how dishonest the employee was. Limiting "employment" to the effective date of each contract would allow an employee to use each contract's language as a shield to avoid termination for dishonest acts occurring outside that contract's term. Thus, if an act such as stealing was not both committed and discovered during the term of the contract then in effect, it could not be used as a valid basis for termination. The employer would be bound by the remaining employment contract notwithstanding the fact that the employee is a thief. Such a result is unreasonable.

■ Here, the issue becomes whether plaintiffs committed an act of dishonesty that relates to their employment with defendant corporation. Clearly, plaintiffs have had an employment relationship with the corporation from its inception. They both served as corporate officers and employees in the day-to-day business of the corporation. This relationship was continuous from that time until they were placed on leave of absence in the summer of 1993.

The record aptly demonstrates that the instances of dishonesty related to plaintiffs' employment. The evidence included testimony of Mr. Madrazo stating that plaintiffs had assigned themselves income that had not been discussed and approved.

Most importantly, evidence was admitted of entries made in the corporation's ledgers showing that corporate funds had been paid to D.W. Gill Supply. However, the checks were actually issued to Engine Enterprise, the 'entity' owned by plaintiffs. Further, Mr. Gill testified that an invoice purportedly from his company was not generated on the forms his company uses. Also, each plaintiff acknowledged that he had not reported any funds received from Engine Enterprise on his income tax records. Thus, the record amply supports defendant's termination of plaintiffs for their dishonest acts. Defendant did not breach the employment agreements by terminating plaintiffs.

■ We turn briefly to the notice of termination. The trial court found that even "if the alleged dishonesty had fallen within the bounds of the Employment Agreements, the written notice given Plaintiffs was woefully inadequate to trigger the termination provisions of the agreements."

The contracts did contemplate notice of termination. They state:

Employer may not terminate this Agreement for just cause unless Employer has first given Employee five (5) days prior written notice of termination which sets forth the grounds of termination, and Employee has failed to cure the stated grounds of termination within the five day period.

As stated previously, plaintiffs were both presented written notice of their termination. These notices terminated plaintiffs for their "apparent unlawful interception and conversion of company funds...." The notices were effective one week after they were issued.

The trial court's finding that the notices were inadequate fails to consider the circumstances under which the notices were issued. The notices were given to plaintiffs after meeting with the corporation's officials. During that meeting, plaintiffs were asked to respond to allegations that they had stolen funds from the corporation. Plaintiffs did not respond to these allegations. The corporation knew at that time that plaintiffs had improperly diverted funds from it, but did not know many specifics. Therefore, under the circumstances, the notices adequately informed plaintiffs of the apparent grounds for termination.

Further, under the notice provisions of the employment agreements, defendant not only had to give five days prior notice, plaintiffs had the right to "cure the stated grounds for termination within the five day period." A proviso added, that a plaintiff "may have no more than two (2) opportunities to correct during any twelve (12) month period." It is questionable whether it is possible for an employee to remedy a breach such as occurred here, "or to expect [employer] to continue to perform the contract." *See Leghorn v. Wieland*, 289 So.2d 745, 747–48 (Fla.App. 1974).

Defendant's point is granted. The trial court's judgment in favor of plaintiffs and against defendant is reversed.

Pursuant to Rule 84.14, we enter judgment for plaintiffs and against defendant on defendant's counterclaim. Further, we enter judgment for defendant and against plaintiffs on plaintiffs' petition.

PUDLOWSKI and GARY M. GAERTNER, JJ., concur.