K–O ENTERPRISES, INC., a Missouri Corporation d/b/a O'Brien Swimming Pool Service and Mark O'Brien, Individually, and as a Minority Shareholder of K–O Enterprises, Inc., Appellants,

v.

Kevin J. O'BRIEN, Respondent.

No. ED 84960.

Missouri Court of Appeals, Eastern District, Division Two.

June 30, 2005.

123

Ira M. Potter, St. Louis, MO, for appellant.

James D. Bass, Clayton, MO, for respondent.

PATRICIA L. COHEN, Presiding Judge.

### Introduction

The claims underlying this appeal arose when Kevin O'Brien terminated his brother, Mark O'Brien, from K–O Enterprises, Inc. ("K–O"), a closely held family business. Mark appeals two summary judgment orders entered by the Circuit Court of St. Louis County in favor of his brother, Kevin. Specifically, Mark appeals the court's order granting summary judgment in favor of Kevin on: (1) K–O's claims against Mark for specific performance of a stock purchase agreement; and (2) Mark's individual and derivative claims, purportedly on behalf of K–O, and against Kevin, for an equitable accounting, conversion and fraud. We affirm in part and reverse and remand in part.

### Statement of the Facts and Proceedings Below

In 1987, Kevin developed a swimming pool service business. By 1989, the business had grown such that Kevin hired his brother, Mark, to work as his employee. In 1992, Kevin incorporated the swimming pool business as K–O Enterprises, Inc. K–O is a Missouri Corporation doing business as O'Brien Swimming Pool Service.

In 1994, Kevin agreed to sell up to twenty-five percent (25%) interest in K–O to Mark. Kevin stipulated that the purchase would take place over a three (3) year period pursuant to the terms of a Stock Purchase Agreement ("the Agreement"). On January 1, 1995, K–O and Mark entered into the Agreement which governed not only the terms for the stock purchase, but also delineated transfer restrictions and buy-out requirements. Ultimately, Mark acquired twenty-five percent (25%) interest in K–O while Kevin retained the remaining seventy-five percent (75%) majority interest.

Pursuant to the Agreement, K–O's value was to be determined every other fiscal year. However, the value of Mark's stock could be determined by either party at any time. Likewise, the Agreement contained a provision that would activate in the event that Mark left K–O. Under the Agreement, K–O had the right to purchase Mark's stock "[u]pon the termination of [Mark's] employment for any reason, regardless of who initiated Mark's termination." However, if upon a termination of Mark's employment, the value of the stock had not been determined within twelve (12) months preceding such termination, the stock value "shall be its fair market value as of the end of the fiscal year preceding his ... termination of employment ... as determined under the business valuation by the accountant then providing the accounting service to [K–O] using regularly accepted accounting principles consistently applied. The determination of the accountant shall be final and binding on the parties."

On or about December 27, 2001, K–O, through Kevin, terminated Mark's employment. There had been no determination of the value of K–O within the twelve (12) months preceding Mark's termination and, in fact, no valuation had taken place since January 1, 1995, the date the Agreement was signed.[1]

In January of 2002, Scott Alton, who was providing accounting and tax services to K–O at the time, performed a valuation of K–O. Alton used, what both he and Kevin contend are, the "regularly accepted accounting principles consistently applied," to perform the business valuation. Ultimately, Alton determined that the value of K–O on December 31, 2000, the end of the

---

**1.** On January 1, 1995, K–O was valued at $170,000.

fiscal year preceding Mark's termination, was $131,316.00. Moreover, Alton determined that due to Mark's twenty-five percent minority interest in the Company and the lack of marketability of shares in a closely held corporation, Mark's interest should be discounted by one-third for a total of $21,886.00.

On April 23, 2002, K–O tendered a check in the amount of $5,471.50 and, in accordance with the Agreement, a promissory note in the amount of $16,415.00. Mark, however, did not accept the check and refused to tender the K–O stock in accordance with the Agreement. Instead, Mark, individually and in his capacity as a K–O shareholder, filed suit against Kevin seeking an equitable accounting, claiming that Kevin had converted property, money and assets from K–O, and engaged in fraudulent acts.

Kevin answered Mark's Petition and raised several affirmative defenses. In response to Mark's claims, Kevin asserted, *inter alia,* that Mark lacked the legal capacity and/or standing to bring his action because: (1) upon his termination, Mark lost his right to hold K–O stock; (2) the conduct and actions Mark challenged occurred prior to the time Mark became a K–O shareholder; (3) Mark had unclean hands; (4) waiver, estoppel and laches barred relief; and (5) Mark's Petition was barred by the "business judgment rule."

Following the filing of Mark's suit, K–O filed suit against Mark seeking specific performance of the buy-out clause of the Agreement. Mark filed an Answer asserting that specific performance was inappropriate because of Kevin's "wrongful, fraudulent and inequitable conduct" and unclean hands. Thereafter, K–O filed a Motion for Summary Judgment on its Petition for Specific Performance asserting that, under the Agreement, Mark was required to sell his shares after K–O's accountant properly

determined the value of Mark's stock because, as per the Agreement, that determination was both final and binding.

In response to K–O's Motion for Summary Judgment, Mark contended that Alton did not have valuation experience and that his deposition testimony disclosed problems with the valuation. Moreover, Mark alleged that no true financial statements existed for K–O and therefore the valuation was based on unedited income statements as well as trial balances furnished by K–O. Mark used statements from Alton's deposition to demonstrate that Alton: (1) was unaware of whether any industry-wide method existed as to how to determine the value of a company; and (2) failed to consider unrecorded profits coming from cash and trade transactions the inclusion of which would have materially affected the valuation.

Mark also relied on Kevin's deposition to establish issues of material fact. In his deposition testimony, Kevin admitted that: (1) K–O paid for Kevin's wife's personal car; (2) he did not utilize any mechanism for entering trade transactions into K–O's accounting system; and (3) he used trade credits for personal use, friends and charitable donations without providing the data on such transactions to Alton. Further, Kevin acknowledged receiving cash from customers while failing to provide any record of such transactions or entering them into K–O's accounting system. He also admitted using K–O employees to finish his basement during normal working hours.

As additional proof of remaining issues of material fact, Mark incorporated an Affidavit from John H. Brandvein, a C.P.A. with thirty-two (32) years of experience in accounting and valuations. Among other things, Brandvein concluded that Alton's valuation: (1) did not reflect the standards of value as required by regularly accepted

accounting principles; (2) did not make the necessary adjustments as required by the PPC's Guide to Business Valuation (the authoritative text among valuation professionals); (3). did not acknowledge and adjust for any non-business or personal expenses; (4) and did not recognize and include the effect of all cash receipts or the value of labor and materials. Ultimately, Brandvein concluded that, utilizing only the information available to him, an accurate valuation of K–O was approximately $600,000.

The court granted K–O's Motion for Summary Judgment on its Petition for Specific Performance and ordered Mark to tender his shares of stock to K–O within ten (10) days of his receipt of the check and promissory note.

Following the grant of summary judgment in favor of K–O and Kevin on their suit, Kevin and K–O filed a Motion for Summary Judgment as to Mark's suit. In their motion, Kevin and K–O argued that: (1) Mark did not have standing to bring a lawsuit derivatively on behalf of K–O because he was no longer a shareholder; (2) Mark was never denied access to the books and records; and (3) Mark was aware of, and benefited from, K–O's accounting practices.

Mark filed a response stating that he was unaware that Kevin did not account for cash flows from cash/barter transactions and that Kevin had sole responsibility for overseeing and administering K–O's recordkeeping. Mark also stated that he relied on Kevin to include all earnings and expenses in K–O's financial books and records. Mark alleged the existence of a genuine issue of material fact with respect to: (1) the nature and extent of Mark's knowledge of K–O's accounting practices; (2) whether Kevin's conduct was illegal, *ultra vires* and a breach of fiduciary duty;

and (3). Mark's individual standing to prosecute his claims.

The court granted Kevin's Motion for Summary Judgment on Mark's individual and derivative claims. Mark appeals both summary judgment Orders in favor of Kevin.

### Standard of Review

Our review of summary judgment is *de novo*. *ITT Commercial Fin. Corp. v. Mid–Am. Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo. banc 1993). We will uphold the grant of summary judgment on appeal if the movant is entitled to judgment as a matter of law and no genuine issues of material fact exist. *Id.* at 377. "[A] 'genuine issue' exists where the record contains competent materials that evidence two plausible, but contradictory, accounts of the essential facts." *Id.* at 382. We view the record in the light most favorable to the party against whom judgment was entered, according that party all reasonable inferences that may be drawn from the record. *Id.* at 376. We accept as true facts contained in affidavits or otherwise in support of a party's motion unless contradicted by the non-moving party's response to the summary judgment motion. *Id.*

Where the party who filed the motion for summary judgment is the claimant in the underlying case, to make a *prima facie* case for summary judgment, he must state with particularity all the undisputed material facts necessary to establish each element of his claim, referencing pleadings, discovery or affidavits to demonstrate the lack of a genuine issue of material fact. Rule 74.04(c)(1); *ITT*, 854 S.W.2d at 380. Once the movant has established a right to judgment as a matter of law, the non-movant must demonstrate that one or more of the material facts asserted by the movant was not in dispute is, in fact, genu-

inely disputed. *ITT,* 854 S.W.2d at 376. The non-moving party may not rely on mere allegations and denials of the pleadings, but must use affidavits, depositions, answers to interrogatories, or admissions on file to demonstrate the existence of a genuine issue for trial. *Id.* A motion for summary judgment need not rest on unassailable proof and is not precluded by "the slightest doubt resting on a scintilla of evidence." *Martin v. City of Washington,* 848 S.W.2d 487, 492 (Mo. banc 1993). Mere doubt and speculation do not create an issue for trial. *Id.* at 492.

### Discussion

### I. Specific Performance

■ In his first point on appeal, Mark asserts that the trial court erred when it granted summary judgment on K–O's claim for specific performance of the Agreement. Specifically, Mark contends that material facts remain in dispute as to whether the valuation performed by Alton was proper and accordingly, the court erred when it summarily granted specific performance.

■ It is well-settled that, "[i]n an action for specific performance, the right to sue is triggered by the failure of a party to do that which is contracted for, in accordance with the procedure established by the contract." *Carondelet Health System, Inc. v. Royal Gardens Assoc.,* 943 S.W.2d 669, 672 (Mo.App. W.D.1997). Accordingly, as the party seeking summary judgment on its petition for specific performance, K–O needed to prove not only that there was no genuine issue of material fact that it performed (or tendered performance of) its portion of the contract but that Mark breached the terms of the Agreement.

As an initial matter, we note that the Agreement governs both K–O and Mark's obligations in the event of Mark's termination and the procedures by which K–O stock would be valued. Pursuant to the Agreement, K–O's value was to be determined every other fiscal year, yet the value of Mark's stock could be determined by either party at any time. Likewise, K–O retained the right to purchase Mark's stock "[u]pon the termination of [Mark's] employment for any reason, regardless of who initiated Mark's termination." However, if upon a termination of Mark's employment, the value of the stock had not been determined within twelve (12) months preceding such termination, the stock value "shall be its fair market value as of the end of the fiscal year preceding his ... termination of employment ... as determined under the business valuation by the accountant then providing the accounting service to [K–O] using regularly accepted accounting principles consistently applied. The determination of the accountant shall be final and binding on the parties."

K–O filed its motion for summary judgment alleging that it had met all of its obligations under these applicable provisions. Specifically, K–O asserted that there was no genuine issue of material fact that K–O terminated Mark's employment and that because there had been no determination of the value of K–O within the twelve (12) months preceding Mark's termination, K–O's accountant, Alton, performed a valuation of K–O using, the "regularly accepted accounting principles consistently applied." Based on the value Alton calculated, K–O tendered Mark a check for partial payment of his share and a promissory note for the remainder.

In order to demonstrate a genuine issue of material fact, Mark focuses on whether Alton used "regularly accepted accounting principles consistently applied" in calculating the value of K–O and thus Mark's share. Mark contends that his summary

judgment response demonstrates Alton failed to use "regularly accepted accounting principles." Additionally, Mark asserts that Alton lacked valuation experience and that his valuation was unreliable because it was based on inaccurate figures.

More specifically Mark alleged that no true financial statements existed for K–O and therefore Alton's valuation was based on unedited income statements as well as trial balances furnished by K–O. In support of his assertions, Mark relied on admissions from Alton's deposition to demonstrate that Alton: (1) was unaware of whether any industry-wide method existed as to how to determine the value of a company; and (2) failed to consider unrecorded profits coming from cash and trade transactions the inclusion of which would have materially affected the valuation.

To further support his contention that a genuine issue of material fact existed as to whether Alton's valuation properly utilized all necessary information, Mark referred to portions of Kevin's deposition in which Kevin admitted: (1) K–O paid for Kevin's wife's personal car; (2) he did not utilize any mechanism for entering trade transactions into K–O's accounting system; and (3) he used trade credits for personal use, friends, and charitable transaction without providing the data on such transactions to Alton. Kevin acknowledged receiving cash from customers while failing to provide any record of such case or entering it into K–O's accounting system. Kevin also admitted to using K–O employees to finish his basement during normal working hours.

Mark's most compelling proof of remaining issues of material fact was an Affidavit from John H. Brandvein, a C.P.A. with thirty-two (32) years of experience in accounting and valuations. Brandvein concluded that Alton's valuation: (1) did not reflect the standards of value as required by regularly accepted accounting principles; (2) did not make the necessary adjustments as required by the PPC's Guide to Business Valuation (the authoritative text among valuation professionals); (3) did not acknowledge and adjust for any non-business or personal expenses; (4) and did not recognize and include the effect of all cash receipts or the value of labor and materials. Ultimately, Brandvein concluded that, utilizing only the information available to him, an accurate valuation of K–O was approximately $600,000. In light of these allegations, Mark met his burden of showing that the propriety of the method used to value the stock was, in fact, a genuinely disputed issue for trial.

K–O argues that Mark's reliance on Brandvein's Affidavit to prove the existence of a genuine issue of material fact is misplaced because Brandvein is not K–O's accountant and his Affidavit focuses on Generally Accepted Accounting Principles ("GAAP") despite the fact that K–O and Mark did not agree to use to the use of GAAP or an outside business valuation expert. In support of its contention, K–O argues that the parties expressly agreed that the business valuation would be completed by "the accountant then providing accounting services to [K–O] using regularly accepted accounting principles consistently applied." Essentially, K–O contends that GAAP or "Generally Accepted Accounting Principles" are distinguishable from "regularly accepted accounting principles."

In support of this contention, K–O relies on *Lake Cable, Inc. v. Trittler,* 914 S.W.2d 431 (Mo.App. E.D.1996). While K–O correctly states the outcome of the *Lake Cable* trial and its disposition on appeal, K–O's reliance on *Lake Cable* is misplaced. Although the facts of *Lake Cable* are similar to the facts in the present case, there are several crucial distinguishing factors. Specifically, the perti-

nent language of the agreement in *Lake Cable* is quite different from the Agreement between Mark and K–O. While the parties in *Lake Cable* agreed that *"[b]ook value* shall be determined by general accounting principals [sic] consistently applied in accounting *for the corporation's operations* [,]" K–O and Mark never referenced a "book value" or that accounting principles would be those employed in accounting for K–O's operations. (Emphasis added). To the contrary, K–O and Mark agreed that the *"value of the stock* shall be its fair market value as of the end of the fiscal year preceding his . . . termination of employment . . . as determined under the business valuation by the accountant then providing the accounting service to [K–O] *using regularly accepted accounting principles consistently applied."* (Emphasis added).

Most importantly, the trial court in *Lake Cable* ordered specific performance, and we affirmed on appeal, only after the parties received a full trial on the merits. Indeed, the court afforded both parties a full and fair opportunity to present testimony at trial regarding various possible interpretations of the valuation provision in the agreement. In this case, however, by granting summary judgment on K–O's specific performance claim, the trial court deprived Mark of the opportunity to present evidence to the trier of fact on the appropriateness of the accounting principles applied by Alton.

Under these circumstances, and in light of the fact that we review the record in the light most favorable to Mark, we believe the propriety of the valuation method ap-

plied was sufficiently raised in response to K–O's motion for summary judgment on its Petition for Specific Performance and remains a genuine issue of material fact to be resolved at trial. Point granted.[2]

## II. Derivative and Individual Shareholder Claims

Mark next asserts that the trial court erred when it granted summary judgment on Mark's suit against Kevin. Specifically, Mark contends that he has standing to bring his claims both derivatively and individually. In response, Kevin argues: (1) Mark does not have individual standing to bring his claims against K–O; and (2) in light of our holding in *Schwartz v. Custom Printing Co.,* 926 S.W.2d 490 (Mo.App. E.D.1996), Mark lost standing to bring a shareholder derivative suit the day he was terminated.

■■■ We first address Mark's individual standing to bring suit. As a general matter, "corporate shareholders cannot in their own right and for their personal benefit maintain an action for the recovery of corporate funds or property improperly diverted or appropriated by the corporation's officers and directors" because the injury is to the corporation and not the shareholders individually. *Place v. P.M. Place Stores Co.,* 950 S.W.2d 862, 865 (Mo. App. W.D.1996). Likewise, an action based on acts relating to a corporation's capital stock as a whole is a corporate cause of action that can only be sued for derivatively. *Id.* Here, the underlying allegation in each of Mark's three counts against Kevin is that Kevin misappropriated corporate assets and opportunities be-

---

**2.** In his second and third points on appeal, Mark alleges that the trial court erred when it granted summary judgment on K–O's Petition for Specific Performance because: (1) K–O failed to assert material facts to negate his affirmative defenses to K–O's Petition for Specific Performance; and (2) K–O, by and through Kevin, engaged in inequitable con-

duct thus denying it the benefit of the equitable remedy of specific performance. In light of our determination that summary judgment was inappropriate because there remains a genuine issue of material fact to be resolved at trial, we decline to address Mark's Point II and Point III.

longing to K–O. Accordingly, Mark did not have standing as an individual to bring suit for the corporate assets and opportunities belonging to K–O.

■ We next address Mark's standing to bring his suit as a shareholder derivative action. Kevin asserts that Mark lost any standing he had to bring his claims against Kevin derivatively when K–O, by and through Kevin, terminated Mark's employment. In support of his assertion, Kevin relies on *Schwartz, supra.*

In *Schwartz,* the plaintiff brought suit after his termination seeking specific performance of a "Common Stock Agreement" and claiming breach of fiduciary duty individually and derivatively, on behalf of the corporation. The plaintiff's employment was governed by both an employment contract as well as a "Common Stock Agreement" which provided, in pertinent part, that whenever plaintiff's employment ceased, for any reason, his shares of stock were to be sold back to the corporation. *Schwartz,* 926 S.W.2d at 492. The corporation terminated plaintiff and he filed suit against the corporation. *Id.* In his second amended petition, which was the subject of his appeal, plaintiff alleged several causes of action including, *inter alia,* a shareholder derivative claim for breach of fiduciary duty. *Id.*

On appeal, we affirmed the trial court's grant of summary judgment on plaintiff's shareholder derivative claim holding that, in that case, plaintiff lacked standing to file a derivative action because under the terms of the Common Stock Agreement, plaintiff lost his right to hold shares in the corporation as soon as he was terminated. *Id.* at 494. Specifically we found, "[plaintiff's] standing as a shareholder—and the concomitant right to bring a shareholder derivative action—was abolished on July 12, 1991[,]" the date of his termination. *Id.* Kevin asserts that in light our holding in *Schwartz,* Mark lost his standing to bring a shareholder derivative action the day he was terminated.

Mark argues that under Rule 52.09, the Missouri Rule governing Derivative Actions by Shareholders, Mark was only required to be a shareholder at the time of Kevin's alleged wrongdoing and therefore his ultimate termination is irrelevant to his derivative suit. Mark's assertion is contrary to our holding in *Schwartz* and unpersuasive. Consistent with *Schwartz,* Mark lost his standing to bring suit as of the date he was no longer a shareholder of K–O. *See also, PVI, Inc. v. Ratiopharm GmbH,* 253 F.3d 320, 328 (8th Cir.2001) (because the plaintiff no longer held "an equitable ownership interest in [the corporation], under Missouri law [plaintiff] could not bring a shareholders' derivative suit on behalf of [the corporation]."). Accordingly, because Mark had neither individual nor derivative standing to bring suit against Kevin, the court properly granted Kevin's Motion for Summary Judgment. Point denied.[3]

### Conclusion

The judgment of the trial court is affirmed in part and reversed and remanded in part.

KATHIANNE KNAUP CRANE and ROBERT G. DOWD, JR., JJ., concur.

---

**3.** In his final point on appeal, Mark alleges that the trial court erred when it granted summary judgment on Mark's Petition for an equitable accounting, conversion and fraud because there exists a genuine issue of material fact as to whether Mark ratified Kevin's alleged wrongful conduct. In light of our determination that Mark lacked standing to bring this suit, we do not address Mark's final point.