CB COMMERCIAL REAL ESTATE GROUP, INC., Appellant/Respondent,

v.

EQUITY PARTNERSHIPS CORPORATION, Penn National Partners, L.P., and P.N. Associates, L.P., Respondents/Appellants.

Nos. WD 49888, WD 49933.

Missouri Court of Appeals, Western District.

March 19, 1996.

642

David A. Welte, Kansas City, for appellants.

Leonard Rose, Kansas City, for respondent.

Before LAURA DENVIR STITH, P.J., and LOWENSTEIN and HANNA, JJ.

HANNA, Judge.

CB Commercial Real Estate Group, Inc. (Coldwell Banker), filed a breach of contract suit against Equity Partnerships Corporation (Equity Partnerships), Penn National Part- ners, L.P., (Penn National), and P.N. Associates, L.P. The defendants counterclaimed, charging that the plaintiff breached its agreement. The case was tried to the court. Both sides have appealed.

The plaintiff is a commercial real estate company, which provides property management, leasing, and sales brokerage services. The defendants, while technically separate, are related entities whose primary business is the ownership of a commercial office building at 4370 West 109th Street, Overland Park, Kansas. P.N. Associates, L.P., a general partnership with Equity Partnerships and Penn National as partners, owns the property.

There were three agreements between the parties, all related to this property. Two of the agreements, both dated February 9, 1987, consisted of an Exclusive Leasing Listing Agreement (leasing agreement) and a Management Agreement (management agreement). The third agreement was an Exclusive Sales Listing Agreement (sales agreement), dated July 30, 1990. These agreements between Coldwell Banker and P.N. Associates designated Coldwell Banker as the exclusive leasing, sales, and managing agent for the property.

Counts I, II, and III of plaintiff's amended petition alleged a breach of contract. Coldwell Banker sought recovery of a leasing commission pursuant to the leasing agreement, which gave Coldwell Banker the exclusive right to negotiate a lease of the property for a period ending February 28, 1988. In June 1987, the United States of America (the U.S. Marine Corps) leased, from P.N. Associates, 11,500 square feet of the building for a five-year term, commencing August 1, 1987. Later, the leased area was increased to 14,-685 square feet. The lease gave the lessee the right to terminate after the fourth year upon ninety days written notice. Therefore, the leasing commission was computed based upon the first four years of the lease, for a total of $43,314.41. The parties do not dispute this amount. The trial court found in favor of Coldwell Banker and awarded damages in the amount of $43,314.41, interest at the rate of 9% per annum from May 1, 1991

to May 4, 1994, in the amount of $12,197.94, and reasonable attorney fees of $22,000.

In Count IV, Coldwell Banker sought a declaration of the legal effect of an addendum to the sales agreement between Coldwell Banker and P.N. Associates, claiming that it did not operate to postpone the payment date of the Marine Corps lease commission (the subject matter of Counts I, II, and III) to the date of the sale of the property. The trial court declared that the addendum was not an accord and satisfaction of the lease agreement, did not operate to settle any dispute concerning excess costs of tenant improvements, and did not postpone the leasing commission payment date. However, the court held that it did operate to forgive payment of interest on the commission through May 1, 1991, the date the lawsuit was filed.

Count V was a breach of the sales agreement in which Coldwell Banker claimed that it was entitled to a sales commission of $165,-000,[1] interest, and attorney fees. Approximately 60 days after the sales agreement had been signed, P.N. Associates renegotiated its second mortgage on the property by extending the maturity date (payment of the principle) and reducing the interest rate. Coldwell Banker claims that the extension of the maturity date and the reduction of the interest rate of the defendant's second mortgage was a refinancing of the debt, which triggered a sales commission, pursuant to paragraph 2(f) of the sales agreement. The trial court found that the loan extension was not a refinancing and ruled in favor of the defendants.

Equity Partnerships and Penn National, in their capacity as general partners of P.N. Associates, filed a counterclaim against Coldwell Banker for breach of contract, claiming that Coldwell Banker failed to oversee tenant improvements on the Marine Corp space. The trial court held in favor of Coldwell Banker on the defendants' counterclaim.

A number of points are raised, which will be addressed in the order set out in the briefs. First, the defendants, in their cross-appeal, maintain that Coldwell Banker's Third Amended Petition failed to state a cause of action in that the trial court lacked subject matter jurisdiction because the petition did not allege that Coldwell Banker was a licensed real estate broker. Because this point goes to all of the counts in Coldwell Banker's Third Amended Petition, we will address it first. Next, Coldwell Banker argues that the trial court's ruling on Count V: 1) was against the weight of the evidence; 2) erroneously applied Missouri law regarding the construction of unambiguous contracts; and 3) alternatively, erroneously applied Missouri law regarding the construction of ambiguous terms in the 1990 Sales Agreement.

## REAL ESTATE LICENSE— ALLEGATION AND PROOF

■ The defendants claim that because Coldwell Banker did not allege in its Third Amended Petition that it was a licensed real estate broker, the petition failed to state a cause of action. Therefore, the defendants argue, the court lacked subject matter jurisdiction to hear and adjudicate any of Coldwell Banker's claims.

■ Section 339.160, RSMo 1994, provides that a plaintiff cannot bring an action in the capacity of a real estate broker or salesman in this state for the recovery of compensation for services rendered without alleging and proving that it was a licensed real estate broker or salesman at the time when the cause of action arose. *See Dolan v. Ramacciotti,* 462 S.W.2d 812, 816 (Mo. banc 1970). Coldwell Banker acknowledges that it did not allege that it was a licensed broker. This deficiency was not raised in the trial court. The defendants raise the issue here for the first time, maintaining that the absence of an allegation that it was a licensed real estate broker leaves the pleading jurisdictionally deficient. A failure to plead these facts, by statute and case law, leaves the petition fatally defective in that the plaintiff has failed to establish subject matter jurisdiction. § 339.160, RSMo 1994; *Sandbothe v. Williams,* 552 S.W.2d 251, 255 (Mo.App. 1977).

The defendants did not object to the deficiency in the petition, file a motion challeng-

---

1. This requested sales commission is equal to three percent of the $5.5 million.

ing the matter, or object to any of the testimony by Coldwell Banker's witnesses, who testified extensively concerning Coldwell Banker's commercial real estate activities, the commission disputes, and the three agreements entered into by the parties. The defendants have cited a number of cases, which hold that the statute mandates that the allegation be pleaded. We observe that in each case cited the parties raised the issue early in the pleading stage of the proceedings and the plaintiff had the opportunity to correct the deficiency. In each case the plaintiff either refused to plead that he or she was a licensed real estate salesperson or broker or admitted that he or she was not. Here, the defendants waited until the appeal was brought to first raise the issue.

The Third Amended Petition alleged that the plaintiff, CB Commercial Real Estate Group, Inc. is qualified to do business in Missouri, and that the parties entered into various real estate contracts for the sale and lease of defendant's real estate. Attached to the petition were the real estate sales and leasing contracts.

There was testimony that Coldwell Banker was a commercial real estate service provider firm and that it provided asset management, property management, leasing, sales, brokerage, consultation, appraisal, and financing services. The evidence also showed that Coldwell Banker maintained an office in Kansas City, Missouri, and in other locations. Acting as a real estate broker, Coldwell Banker engaged in the real estate business on various commercial properties with the defendants in Missouri, Kansas, and Arizona on numerous occasions. There were letters from Coldwell Banker to the defendant about the disputed commission, which identified Coldwell Banker as the "procuring broker." The defendants acknowledged and accepted the letters' contents. Further, the defendants acknowledged, on more than one occasion, that they owed a real estate commission to Coldwell Banker.

The pleadings and the evidence not only proved that Coldwell Banker fell within the definition of a real estate broker, § 339.010.1(2)–(4), and was acting within this state in the capacity of a real estate broker,

but also proved that it was a licensed real estate broker. We hold that § 339.160 was satisfied by the evidence and that the evidence resulted in an amendment of the pleadings to conform to the evidence. Mo. R.Civ.P. 55.33(b); *Murray v. Ray*, 862 S.W.2d 931, 934 (Mo.App.1993). Coldwell Banker proved that it was a licensed real estate broker and had standing to bring its lawsuit.

## COUNT V—REFINANCING

■ Coldwell Banker raises three points on appeal concerning the trial court's decision on Count V. Specifically, Coldwell Banker contends that the trial court's judgment as to this count was against the weight of the evidence and erroneously applied the law regarding the construction of unambiguous contracts. In the alternative, Coldwell Banker contends in its third point that the court erroneously applied the law concerning the construction of ambiguous terms in the sales agreement.

In Count V, Coldwell Banker claimed that it was entitled to a sales commission pursuant to paragraph 2(f) of the sales agreement. This paragraph states that Coldwell Banker was entitled to a sales commission in the event:

Owner refinances the Property either by restructuring existing debt, adding new debt, or reconstituting the entity which owns the property to include additional parties in ownership of the Property or to exclude parties who presently have an interest in the Property, from ownership of the Property.

When the July 1990 sales agreement was executed, P.N. Associates' second mortgage at Mission Bank was due on September 30, 1990. The interest rate at that time was 10%. The defendants and Mission Bank extended the due date 90 days to December 28, 1990, and increased the interest rate from 10% to 12½%. Later, the December 28 due date was extended another 90 days to March 30, 1991, and the interest rate remained at 12½%. Coldwell Banker does not maintain that these two 90 day extensions of the maturity date negotiated after the July 1990 sales agreement constituted a "refinancing" within

its definition that would entitle it to a sales commission under para. 2(f) of the 1990 Sales Agreement. Finally, in the transaction of which Coldwell Banker complains, the maturity date was extended two years to March 30, 1993, and the interest rate reduced to 10%. During this period, the principal of the second mortgage remained the same. The first mortgage, which was with Travelers, was $2.4 million and it remained unchanged.

■ The right of a broker to recover a commission depends upon the specific terms of that broker's contract. *Ham v. Morris*, 711 S.W.2d 187, 189 (Mo. banc 1986). The sales agreement here provided for a sales commission if, during the term of the agreement, a purchaser was procured by the broker, owner, or anyone else who was ready, willing, and able to purchase the property on the terms set forth in the agreement. The sales agreement was on a pre-printed form, except for the typewritten addition of paragraph 2(f). This paragraph was drafted and inserted into the contract by Coldwell Banker in response to a previous commission dispute concerning an Arizona real estate transaction between Coldwell Banker and many of the same individuals involved here. Paragraph 2(f) was designed to protect Coldwell Banker from a restructured mortgage debt, which, in essence, would amount to a sale of the property if a new party was brought into ownership.[2] The defendants' evidence agreed that paragraph 2(f) was to protect Coldwell Banker from losing a commission in the event another party or a lender obtained an economic interest in the property, which would amount to a sale of the property.

■ The primary rule in the interpretation of contracts is to ascertain the intent of the parties and to give effect to that intent. *Marshall v. Pyramid Dev. Corp.*, 855 S.W.2d 403, 406 (Mo.App.1993). When the language is unambiguous, the intent of the parties is reflected within the language of the contract and the court will determine the parties' intent from the four corners of the document itself. *Id.* An ambiguity in a contract arises only from the terms susceptible to fair and honest differences, not mere disagreements as to construction. *Hill v. McDonald's Corp.*, 709 S.W.2d 169, 170 (Mo.App.1986). A determination as to whether a contract is ambiguous is a question of law to be decided by the court. *Royal Banks of Missouri v. Fridkin*, 819 S.W.2d 359, 361 (Mo. banc 1991).

Both sides offer definitions of refinancing from BLACK'S LAW DICTIONARY 980 (Abridged 6th Ed.1991): "to finance again or anew; to pay off existing debts with funds secured from new debt; to extend the maturity date and/or increase the amount of an existing debt; to arrange for a new payment schedule." See also, WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY, 989 (1991) in which the term is defined "to renew or reorganize the financing of; to finance something anew." "Restructure" is defined "to change the makeup, organization, or pattern of." WEBSTER'S NEW COLLEGIATE DICTIONARY, 980 (1981).

■ Of the numerous definitions of "refinance" offered, Coldwell Banker maintains that the application of any one of them would serve to prompt a sales commission. Coldwell Banker argues that the definition "to extend the maturity date" constitutes a refinancing. While "refinance" may be susceptible to various definitions, it should be interpreted in the context of the subject matter of the contract in which it is employed and given its plain meaning. Seeming contradictions must be harmonized away if reasonably possible, *State Mut. Life Assurance Co. v. Dischinger*, 263 S.W.2d 394, 401 (Mo. 1953), and the court's interpretation should not reach an absurd or unreasonable result.

---

**2.** Coldwell Banker also makes the argument that the refinancing here resulted in a diminished desire to sell the property, an argument based on an unpublished case in the United District Court for the Eastern District of Missouri, which is an unrelated real estate transaction in St. Louis, wherein Coldwell Banker was the successful plaintiff. *CB Commercial Real Estate Group, Inc. v. Farm & Home Savings Ass'n*, Case No 91– 1833C(8) (E.D.Mo. Aug. 17, 1993). Coldwell Banker was allowed a sales commission because the property was removed from the market as a result of a nonjudicial foreclosure sale. There was a specific provision in the sales agreement that Coldwell Banker would be entitled to a commission if the property was removed from the market. Neither the argument or the case is persuasive here.

Hence, a definition offered by a party that is not compatible with the tone of the contract, the general understanding of the parties regarding the contract, and the specific clause under the contention will be disregarded. *Sanders v. Wallace,* 884 S.W.2d 300, 303 (Mo.App.1994).

The exact meaning of "refinance" must depend largely on the kind and character of the contract, its purpose and circumstances, and the context in which it is used. *See Van Deusen v. Ruth,* 343 Mo. 1096, 125 S.W.2d 1, 4 (1938). An interpretation of a contract that creates unreasonable results, when a more probable and reasonable construction can be adopted, will be rejected. *Empire Gas Corp. v. Small's LP Gas Co.,* 637 S.W.2d 239, 247 (Mo.App.1982). In determining the intention of the parties, the courts should look for a reasonable and natural construction of their agreement. *Tri–Lakes Newspapers, Inc. v. Logan,* 713 S.W.2d 891, 894 (Mo.App.1986). We apply the plain meaning of the words as they are used within the context of the real estate contract.

The purpose of a real estate contract is to sell the property. In turn, the contract provides for a commission in the event of a sale. It also provides for a commission, among other contingencies, in the event the seller takes the property off of the market, or refinances by restructuring its debt.

Applying its definition of choice, Coldwell Banker argues that the "refinancing" that occurred here triggered a sales commission. *Coldwell Banker* explains its rationale: "If the owner was successful in restructuring existing debt or refinancing, there would be no motivation to sell the Property. Thus, the refinancing/restructure would effectively constitute removal of the Property from the market."[3]

What occurred here was no more than a renewal of an existing debt, during which, on one occasion, the prime rate increased and at the other time, it decreased. It is not a reasonable interpretation of the term to require the payment of a real estate commission in the event that an owner extends the maturity date (and decreases the interest rate) on a second interest-only mortgage when the principal remains the same and there is no change in any of the terms of the first mortgage. If it were otherwise, a sales commission would be due under Coldwell Banker's definition if the second mortgage was extended 30, 60, or 90 days; whether the mortgage rate was increased or decreased in any amount, so long as the maturity date was extended or interest rate changed. Coldwell Banker's rationale would entitle it to a commission if the defendants refinanced the property, as they did during the term of the sales agreement, to obtain two 90–day extensions on the maturity date of the Mission note and the increase of the interest rate from 10% to 12½% in connection with the first extension. Further, under Coldwell Banker's definition, a sales commission would be due if the defendant had obtained a short term loan of $1,000. Such a result would be unreasonable and is therefore, rejected. What transpired does not, under any strained interpretation of paragraph 2(f), amount to a sale of the property.

Coldwell Banker's argument that the change in the mortgage terms would take the property off of the market and would diminish the seller's interest in selling the property is not persuasive. It is just as reasonable to presume that the extension of the due date and reduction of the interest rate enabled the seller to keep the property on the market, unhampered by financial concerns.

The trial court determined that the two year extension of the maturity date was not a refinancing or restructuring of the loan. We agree. A reasonable and practical interpretation of paragraph 2(f) would be to protect Coldwell Banker's right to a sales commission in a situation when either a lender or another party obtained an economic interest in the property, even though the transaction was not structured as a sale. Point denied.

## COUNTS I—IV

Next, the defendants appeal the judgment rendered against them on Counts I, II, and

---

**3.** Although there was extensive testimony before the trial court, no argument is presented here that the property was taken off of the market or that the defendants were less inclined to sell.

III, and the trial court's declaration in Count IV. Coldwell Banker claimed in Counts I, II, and III that the defendants breached the leasing agreement in that they did not pay the leasing commission. The trial court entered judgment against Equity Partnerships and Penn National, the general partners of P.N. Associates, in the principal amount of $43,314.41, together with pre-judgment interest in the amount of $12,197.94 at the rate of 9% per annum from May 1, 1991 to May 4, 1994, and plaintiff's agreed attorney fees in the amount of $22,000. On Count IV, the court held that the addendum to the 1990 sales agreement was not an accord and satisfaction and did not settle any dispute between the parties.

On appeal, the defendants' first defense to the judgment on Counts I, II, and III is that Coldwell Banker failed to allege and prove that it was a licensed real estate broker. We have determined that Coldwell Banker's petition, lacking an allegation that it was a licensed real estate broker, was amended by the evidence, therefore, we now address only points two and three. In the defendants' second point they argue that the judgment was not supported by substantial evidence. In their third point, they contend that the second sentence of the addendum was rendered meaningless by the trial court's interpretation that the addendum did not postpone the payment date of the commission. The first two defenses would completely bar Coldwell Banker's claim to a leasing commission, while the defense related to the addendum affords only partial relief: the postponement of the interest payment on the judgment until the property was sold.

On or about June 5, 1987, the United States of America entered into a lease with P.N. Associates for space in the building for use by the U.S. Marine Corps. The parties do not dispute that the leasing commission was $43,314.41. In accordance with the leasing contract, the commission was payable upon execution of the lease between P.N. Associates and the tenant.

Under the Marine Corps lease agreement, P.N. Associates was required to make certain improvements before the property would be occupied. At Equity Partnerships' request, Coldwell Banker obtained bids for the construction of the tenant improvements, one of which was from Carl Rapp, a general contractor, for $154,833 to construct the tenant improvements. Equity Partnerships verbally agreed to Rapp's bid to finish out the Marine Corps space, and it did so without reading the bid. Subsequently, Coldwell Banker advised Equity Partnerships that the bid from Rapp did not include the costs for duct work and carpet, both of which were required under the Marine Corps lease. These two items increased the renovation cost in the amount of $38,982. P.N. Associates disclaimed any responsibility for the extra costs of the duct work and the carpet. The defendants' counterclaim pleaded a set-off for the increased cost of the Marine Corps renovation in the amount of $38,982 against Coldwell Banker's claim in Counts I, II, and III. The trial court ruled in favor of Coldwell Banker.

In the 1990 sales agreement there was an addendum, set forth below, which the defendants maintain was a defense to Coldwell Banker's claim for the leasing commission. The parties frame their arguments in points two and three around the addendum to the 1990 sales agreement. They argue that the addendum was an accord and satisfaction, which postponed the payment of the leasing commission until the property was sold. The property was not sold during the term of the lease. The addendum to the 1990 sales agreement was drafted and inserted by Coldwell Banker and provides:

It is expressly understood between Owner and Broker that there is an outstanding commission in the amount of $43,314.14 for a previous transaction between Owner and the U.S. Marines (U.S.Government). The amount due, $43,314.41, shall be paid upon closing in addition to all commissions earned from the sale of the Pennsylvania National Building according to the Schedule of Sale and Lease Commissions attached to this Agreement.

Count IV of Coldwell Banker's Third Amended Petition asked for a declaration of the parties' rights, asserting that the addendum was not an accord and satisfaction of the leasing agreement, was simply a reaffirma-

tion by the parties that P.N. Associates owed Coldwell Banker the leasing commission on the Marine Corps lease, and did not postpone the payment date of the leasing commission on the Marine Corps lease to the date of the sale of the property. The trial court agreed, however, it further declared that this paragraph did operate to forgive the payment of interest on the Marine Corps commission until May 1, 1991, the date suit was commenced to recover the same.[4]

The defendants claim that they were entitled to a set-off in the amount of $38,982 on the judgment entered against them for the leasing commission. The defendants argue that the addendum to the 1990 sales agreement was an accord and satisfaction, which operated to settle the parties' dispute concerning the cost overruns for the tenant improvements on the Marine Corps space and the payment date of the leasing commission. The defendants argue that the trial court's ruling that the addendum did not settle the parties' dispute was not supported by the evidence.

The substantial evidence, the defendants argue, was from Mr. Shapiro, of Equity Partnerships, who testified that the payment date of the lease commission was postponed to the date the property was sold in exchange for the defendants' agreement to give Coldwell Banker the exclusive right to sell the property for an extended period in excess of the standard amount of time. Also, the defendants claim that because Coldwell Banker failed to call its employee, Natalie Wolfe, the defendants were entitled to a presumption that her testimony would have been adverse to Coldwell Banker's position at trial. The defendants argue that the only testimony to support the court's ruling was that of Mr. Teaney, of Coldwell Banker, but his testimony consisted only of "his private, unexpressed intentions that he did not intend the addendum to be a settlement of the parties disputes...."

However, the defendants miss the point. It takes no evidence to support the trial court's ruling against the defendants because the defendants had the burden of proof and persuasion. *See Ensminger v. Burton*, 805 S.W.2d 207, 217 (Mo.App.1991). The accord and satisfaction here presupposes the existence of a contract between the parties, in which Coldwell Banker agreed to supervise the tenant improvements and breached the agreement by not insuring the inclusion of all improvements before the defendants accepted Rapp's bid. The defendants argued to the trial court that their counterclaim was a breach of contract.

Accord and satisfaction is an affirmative defense and the risk of nonpersuasion rests upon the defendants to prove the terms of the agreement, as well as its execution. *Id.* Nevertheless, we have reviewed the evidence and are satisfied that not only could the trial court have concluded that the defendants did not sustain its burden, but also, there was evidence to support the decision that there was no accord and satisfaction. There is no purpose served by lengthening this opinion by reciting the other evidence supporting the trial court's decision, as the matter is resolved by the defendant's obligation to convince the fact-finder of its affirmative defense.[5] The trial court properly concluded that the defendants failed to meet their burden of persuading the court that the addendum was an accord and satisfaction or, if so, of its breach.

Finally, the defendants argue that the trial court obviously found that the addendum was unambiguous and, therefore, the only issue was what the addendum meant. In that regard, the defendants assert that the court's interpretation was unreasonable because it rendered the second sentence meaningless. Whatever purpose the defendants ascribe to the addendum, the trial court was not persuaded that it settled the parties' dispute

---

4. There is no issue on this appeal concerning the postponement of the interest payment until the commencement of the lawsuit. Neither party objects to the court's decision.

5. The defendants were not entitled to an adverse inference because Ms. Wolfe was not called as a

witness. They were simply entitled to argue the adverse inference and the factfinder was free to pass upon its weight and value. Here, the defendants did not ask or argue to the court that they were entitled to the inference. Not having made the argument, we will not consider it now.

concerning the set-off claim of $38,982. The trial court stated that the addendum merely reaffirmed the defendants' obligation to pay Coldwell Banker its commission and agreed with Teaney's testimony that the addendum's intent was to obtain the Marine Corps commission from the proceeds of the sale if the commission had not been paid by that time. The court's finding is a reasonable interpretation of the paragraph. This is particularly so in light of the fact that the addendum, which the defendants claim to be an accord and satisfaction, does not mention the tenant overruns or the amount of money in dispute, which the defendants claim is the sole purpose of the addendum. There was no new agreement governing the payment of the commission. Point denied.

The judgment of the trial court is affirmed.

All concur.