**Loyd R. SIMPSON, Appellant–Respondent,**

v.

**Stephan C. SIMPSON, Respondent–Appellant.**

**Nos. WD 69810, WD 69831.**

Missouri Court of Appeals,
Western District.

Oct. 6, 2009.

Todd H. Bartels, Esq., and Sharon Kennedy, Esq., St. Joseph, MO, for appellant.

Frederick H. Riesmeyer, II, Esq., and Matthew P. Clune, Esq., Kansas City, MO, for respondent.

Before JAMES E. WELSH, P.J., and VICTOR C. HOWARD and ALOK AHUJA, JJ.

ALOK AHUJA, Judge.

Loyd Simpson filed suit against his son Stephan Simpson to collect on a delinquent promissory note. After a bench trial the circuit court awarded Loyd Simpson judgment for $97,242.58 in damages, and $12,500.00 in attorneys fees and expenses. Stephan Simpson appeals, and Loyd Simpson cross-appeals.

For the reasons which follow, we deny relief on Stephan Simpson's appeal, but reverse on Loyd Simpson's cross-appeal, and remand for recalculation of his recoverable damages.

## Factual Background

In 1999, Loyd Simpson and his wife Patricia Simpson agreed to sell their lumber business, Simpson and Sons Sawmill, Inc., for $1,771,000.00 to their son Stephan Simpson and his then-wife, Cindy Simpson.[1] In connection with the transaction the parties signed two promissory notes on July 15, 1999. The first note was for $500,000.00, and required monthly payments of $12,500.00 beginning September 1, 1999. The second note was for the remaining balance of $1,271,000.00, and also required $12,500.00 monthly payments; payments on the second note were not to begin, however, until the "30th day following the final and last installment" was paid on the first note.

The first note was paid in full in May 2000, and Stephan and Cindy Simpson thereafter began making payments on the second note.

In 2002, Stephan and Cindy Simpson divorced. In connection with the dissolution of their marriage, Stephan agreed to remove Cindy from the second note. On March 4, 2002, Stephan Simpson (hereafter "Son") and Loyd Simpson (hereafter "Father") signed a third promissory note (the "Note") in the amount of $847,711.69, which the parties believed at that time to be the current unpaid balance on the second note. The second note was canceled on or about April 4, 2002.

---

1. Although there is some dispute in the record as to the precise legal name of the business, the issue is not relevant to the disposition of this appeal.

 Patricia Simpson, Loyd Simpson's wife and Stephan Simpson's mother, passed away prior to the institution of this litigation; in the remainder of this opinion we refer to Loyd Simpson as the sole business-seller and lender for ease of analysis.

Under the Note, Son agreed to pay Father "the sum of $847,711.69, together with interest at a rate of 6%, compounded annually." The Note specified that "[Son] shall pay to [Father] on the 1st day of April 2002, and every month thereafter until the indebtedness hereunder is fully paid, the sum of $12,500.00." The Note contained no provision authorizing Son to prepay his indebtedness. To the contrary, the Note provided:

In the event that [Son] fails to transmit to [Father], any of the installments which accrue and become payable throughout the amortization period, within fifteen (15) days of the date said payment is due, [Father] may without further notice declare this Promissory Note in default and, demand payment of the entire amount of the unpaid balance at that time . . . .

In the event of default as set forth herein, [Son] agrees to pay any costs incurred by [Father] which are associated with the collection of this Promissory Note, including, but not limited to, reasonable attorney's fees and expenses.

After the Note's inception, Son made timely $12,500.00 monthly payments to Father for an extended period. From July 2005 through August 2007, however, Son missed twenty-five installment payments (although Son made a one-time lump-sum payment of $124,483.12 in March 2006). In September 2006, Father's counsel sent Son's counsel a letter declaring the Note to be in default due to Son's failure to make any payment since March 2006, and demanding immediate payment of the Note's entire remaining balance.

On January 31, 2007, Father filed suit against Son in Buchanan County Circuit Court. Father alleged two counts, for breach of the Note and for anticipatory repudiation. Son answered and alleged two counterclaims, for unjust enrichment and for reformation of the Note. The gist of Son's counterclaims was his contention that, in light of Son's payments on the first and second notes, the $847,711.69 balance stated in the Note did not correctly reflect the amount which remained owing from Son to Father for purchase of the lumber business, but was instead the product of mutual mistake.

The case was tried to the court on April 28, 2008. On May 14, 2008, the court issued its judgment. The court found in Father's favor on his breach of promissory note claim, thus "render[ing] moot" his claim for anticipatory repudiation. In entering judgment for Father, the court rejected Son's argument that, despite his admitted failure to make the specified monthly payments of $12,500.00 for extended periods, he was not in default because of certain lump-sum payments he had made at irregular intervals: "There is no prepayment clause in the Note nor was [Son] excused from making a $12,500 payment 'every month.' It is not disputed that [Son] ceased making payments under the Note and he is accordingly, in default under the express language of the Note." The court also rejected Son's counterclaims, based on its conclusion that Son "failed to establish by clear, cogent and convincing evidence that the sum calculated due under the Note was erroneous and the product of mutual mistake." The court awarded Father damages of $97,242.58, and attorneys fees and expenses of $12,500.00.

Both Father and Son appeal.

### Standard of Review

"Because this is a court-tried case, our review is under the standard set forth in *Murphy v. Carron*, 536 S.W.2d 30, 32 (1976)." *Urban Renewal of K.C. v. Bank of New York*, 289 S.W.3d 631, 634 (Mo. App. W.D.2009)(citing *Mo. Land Dev. Spe-*

*cialties, LLC v. Concord Excavating Co.,* 269 S.W.3d 489, 496 (Mo.App. E.D.2008)). "We will affirm unless the decision is not supported by substantial evidence, is against the weight of the evidence, or erroneously declares or applies the law." *Id.*

With respect to Son's challenges to the court's rejection of his mutual mistake claim, we note that

> We must exercise our power to set aside a decree or judgment on the ground that it is against the weight of the evidence with caution and only with a firm belief that the decree or judgment is wrong.... As the trier of fact, it is the trial court's function and duty to assess the weight and value of the testimony of each witness. Thus, in determining whether a judgment is against the weight of the evidence, we must give due regard to the trial court's opportunity to judge the credibility of the witnesses. [W]e view the evidence, along with all reasonable inferences, in the light most favorable to the trial court's judgment, and disregard all contrary evidence and inferences.

*O'Dell v. Mefford,* 211 S.W.3d 136, 141 (Mo.App. W.D.2007) (citations and internal quotation marks omitted). In conducting our review, "[a]ll fact issues upon which no specific findings are made shall be considered as having been found in accordance with the result reached." Rule 73.01(c).

■ Given the nature of Son's arguments, we also emphasize that "it is well settled that the trial court is free to believe or disbelieve all, part or none of the evidence, including disbelieving evidence that is uncontroverted." *Beery v. Shinkle,* 193 S.W.3d 435, 443 (Mo.App. W.D.2006) (rejecting claim "that because ... testimony was uncontroverted, it had to be believed by the trial court": "That is a proposition that is not recognized in the law." (citing *Nautilus Ins. Co. v. I–70 Used Cars, Inc.,* 154 S.W.3d 521, 528 (Mo.App. W.D.2005))). Because the trial court was free to reject even uncontroverted evidence, and because Son had the burden of proving the mutual mistake underlying his counterclaims, we also stress that "[i]t takes no evidence to support the trial court's ruling against [Son] because [he] had the burden of proof and persuasion." *CB Commercial Real Estate Group, Inc. v. Equity P'ships Corp.,* 917 S.W.2d 641, 649 (Mo.App. W.D. 1996); *see also, e.g., O'Dell,* 211 S.W.3d at 141 ("'Since the burden of proof was on [Mefford], if the trial court chose to disbelieve [her] evidence, it was not necessary that there be affirmative evidence to support the finding' that Mefford did not take possession of the property and that there was no parol gift." (citation omitted)).

## Analysis

### I.

■ Son's first and second Points Relied On are founded on his claim that the Note mistakenly states the remaining balance owed by Son to Father as of the time the Note was made, March 4, 2002. Although the face amount of the Note is $847,711.69, Son contends that, "when all payments made by [Son] to [Father] [on the first two notes] were properly applied, the correct principal amount for the ... Note ... was $812,719.17 and not the stated amount of $847,711.69." As a result of this alleged overstatement of his outstanding indebtedness at the time of the Note's inception, Son contends that the remaining unpaid balance as of the time of trial was $31,038.91, not the $97,242.58 found by the trial court.

■■ "'[I]t is presumed that a written contract embodies the entire agreement of the parties, and this is particularly so where it is a promissory note which is in dispute.'" *Pac. Carlton Dev. Corp. v. Barber,* 95 S.W.3d 159, 165 (Mo.App. W.D.

2003) (citation omitted). " 'The parole evidence rule prohibits use of oral evidence to contradict or change the terms of a written, unambiguous and complete contract absent fraud, common mistake, accident or erroneous omission.' " *Id.* (citation omitted).

Son urges that the trial court should have deviated from the unambiguous written terms of the Note here, because "the great weight of the evidence ... was that the original balance of the Note should have been $812,719.17, and not $847,711.69," and the principal balance of the Note should have been reformed to correct this mutual mistake. In its judgment the circuit court expressly rejected Son's arguments, finding that Son "failed to establish by clear, cogent and convincing evidence that the sum calculated due under the Note was erroneous and the product of mutual mistake." On this record, we cannot conclude that the trial court's findings of fact are unsupported by substantial evidence or against the weight of the evidence.

 "For reformation to apply there must be 'clear, cogent and convincing evidence' of (1) a preexisting agreement ..., (2) a scrivener's mistake in drafting the agreement, and (3) that the mistake was mutual...." *Ethridge v. Tierone Bank,* 226 S.W.3d 127, 132 (Mo. banc 2007)(quoting *Ethridge v. Perryman,* 363 S.W.2d 696, 698 (Mo.1963)). " 'Reformation of a written instrument is an extraordinary equitable remedy and should be granted with great caution and only in clear cases of fraud or mistake.' " *Id.* (citation omitted). While "[r]eformation allows parties to a contract to conform the writing to their intent," "[t]o support reformation for mutual mistake, the evidence must be clear, cogent, and convincing and upon testimony entirely exact and satisfactory." *Elton v. Davis,* 123 S.W.3d 205, 212 (Mo.App. W.D. 2003).

Parol evidence is admissible to show that because of mutual mistake the writing did not reflect the intentions of the parties. When a party seeks to reform a contract based upon mutual mistake, parol or extrinsic evidence is admissible to establish the mistake and to show how the writing should be reformed to conform to the parties' intention. A mutual mistake occurs when both parties, at the time of contracting, share a misconception about a basic assumption of vital fact upon which they based their bargain. Whether parties are laboring under a mutual mistake is normally a question of fact.

*Brown v. Mickelson,* 220 S.W.3d 442, 448 (Mo.App. W.D.2007) (citations and internal quotation marks omitted).[2]

Son claimed at trial that he overpaid the first ($500,000.00) note by $10,171.08, and that this overpayment acted as a credit on the second promissory note of $1,271,000.00. Based largely on the credit balance he contended existed from the first note, Son argued at trial that a total overpayment of $34,992.42 should be carried forward from the second note to the Note on which Father's claims depend.

Given our standard of review, we cannot overturn the trial court's judgment absent conclusive (or near-conclusive) evidence establishing Son's right to relief. Such evidence simply does not exist here. We highlight only a few of the evidentiary

---

2. Although Son also pled a counterclaim for unjust enrichment, on appeal he argues that he presented evidence of unjust enrichment only as an element of his mutual mistake/reformation claim, not as an independent basis for relief. Given our affirmance of the trial court's finding that no mutual mistake as to the Note's original balance had been proven, we need not address the unjust enrichment theory.

deficiencies in Son's proof. First, at trial Son introduced an exhibit (Defendant's Exhibit E) which, he contended, documented every payment he had made on the first promissory note, resulting in his claimed overpayment of $10,171.08. However, while Exhibit E lists nineteen alleged payments, Son only produced ten checks showing that the listed payments actually were made to Father. As to the remaining nine payments, which totaled $240,000.00, Son submitted bank statements which denominated these transfers from his bank account merely as "miscellaneous debit," "phone/customer transfer debit," "to DDA 149230," or "transfer to # 149230." It is true that Son testified that Exhibit E accurately summarized "records of payments that I made"; but the trial court could reasonably have concluded that this evidence was insufficient to demonstrate that these nine claimed payments went to Father. (The trial court could also justifiably reject Son's claims concerning these additional payments based on Son's testimony that he had seen cancelled checks documenting these payments, but did not produce them at trial.) The uncertainties in the evidence concerning Son's payments on the first note, standing alone, would require us to affirm the trial court's judgment on his counterclaims.[3]

■ The evidence Son presented to attempt to show that the outstanding balance of the second note in March 2002 was less than $847,711.69 suffers from similar potential defects. As a preliminary matter, Son's claim that the "ending" balance of the second note was $812,719.17 depends, in large part, on his claim that he overpaid the *first* note by $10,171.08. But as explained in the preceding paragraph,

the trial court was not required to believe that Son overpaid the first note. Further, in calculating the ending balance of the second note, Son's evidence gave him an immediate credit for certain irregular payments of more than $12,500.00 that he made, and stopped the accrual of interest on the date of those irregular payments. But as explained *infra* § II with respect to the identical language of the Note, Son had no right to prepay the second note, and any prepayment he may have made did not terminate the accrual of the interest to which Father was otherwise entitled. Finally, Son's evidence concerning the proper treatment of a March 2002 payment (and whether that payment should be treated as a credit to the second note or the Note) was confused and inconsistent; although Son contends on appeal that the face amount of the Note is overstated by $34,992.52, given the uncertainties concerning the March 2002 payment his own expert, on direct examination, testified that "the overage possibly is $47,000." It was Son's burden to present "clear, cogent, and convincing" evidence, based "upon testimony entirely exact and satisfactory," *Elton*, 123 S.W.3d at 212; the uncertainties in Son's evidence concerning the second note would likewise have justified the trial court in rejecting his mutual mistake claim.

Finally, we note that Son testified at trial that his ex-wife's attorney supplied the $847,711.69 face amount of the Note, that he did not "run the numbers to come up with that number," and that he only learned that the face amount of the Note was overstated after Father filed this lawsuit. However, Son's sister testified that, while she was working at the family lumber business, Son asked her to "verify the

---

**3.** Although Son contends that Father "admitted receiving all payments," our review of Father's trial testimony indicates that he only

agreed that Son had made the payments documented *by checks*.

$847,000 [sic] figure" at the time the Note was being entered, and that she did so with the assistance of a co-employee and Son's accountant. Son's sister testified that "[o]ur figures came up with that $847,000, and that's what—you know, so when the contract was presented with $847,000 or whatever, our notes matched it." Son's sister also testified that the paperwork documenting her calculations would have been kept at the lumber business, and thus would presumably have been under Son's control. The trial court plainly could have relied on this evidence to conclude that Son had failed to prove, by clear, cogent and convincing evidence that he executed the Note under a misconception as to the proper beginning balance.

 Throughout his briefing and oral argument, Son stresses that the evidence he presented concerning alleged overpayments on the first and second notes was "completely undisputed and unrebutted by plaintiff." (Father limited his evidence to accounting for Son's payments on the Note after its execution in March 2002). But with all respect, this argument simply "miss[es] the point." *CB Commercial*, 917 S.W.2d at 649. Even if uncontroverted, the trial court was entitled to disbelieve Son's evidence. Moreover, Son shouldered the burden of proof (and a heightened "clear and convincing" burden at that); we therefore need not identify (and Father was under no obligation to present) evidence establishing the converse of Son's claims. " '[W]hether parties are laboring under a mutual mistake is normally a question of fact.' " *Brown*, 220 S.W.3d at 448 (citation omitted). We find no basis in this case to overturn the trial court's factual finding that Son "failed to establish by clear, cogent and convincing evidence that the sum calculated [and] due under the Note was erroneous and the product of mutual mistake."

We accordingly reject Son's first and second Points Relied On. We address Son's third Point, concerning the trial court's award of attorneys fees and expenses to Father, *infra* § III, after addressing Father's cross-appeal.

## II.

Father's cross-appeal argues that "[t]he trial court erred in awarding [Father] actual damages of only $97,242.58 on his claim in Count II for breach of contract ... because, given that the trial court correctly determined that there was no pre-payment provision in the Note, Plaintiff was, as a matter of law, entitled to full payment of the remaining principal and all interest that would have been earned on the Note had it been paid according to the Note's express terms without pre-payment of principal." We agree.

 Although the case involved a residential mortgage, the extended discussion of this issue in *Skyles v. Burge*, 789 S.W.2d 116 (Mo.App. E.D.1990), is fully applicable here. *Skyles* explained:

Since the early nineteenth century, the general rule has been that a debtor cannot, without the lender's consent, prepay a mortgage debt. [Under this "perfect tender in time" rule,] without a prepayment clause, the mortgagor could not compel the mortgagee to accept payment or to discharge the mortgage before it was due....

At the present time, the perfect tender in time rule remains in effect in the majority of states, except where it has been modified by judicial decision or by statute. The underlying reasons for the adoption of this principle are varied. One justification for denying a mortgagor's prepayment right is that a mortgage is an investment instrument designed to secure for the mortgagee not only a regular flow of income over a

definite period of time, but also income at a predictable rate of return. Another rationale for disallowing prepayment is that the existence of a promissory note in which the debt is fully amortized by specific payments in equal monthly installments suggests that no early payment is permitted. In addition, courts have relied on the fact that the rights of the mortgagee and mortgagor are equal and reciprocal in that a mortgagee cannot enforce the payment of the debt before its maturity and a mortgagor cannot compel his mortgagee to accept payment before it is due.

Relying on principles of contract law, courts have found, however, that the precise language of the promissory note often entitles a mortgagor to prepay his indebtedness. Thus, promissory notes which specify payments "on or before" a date certain, as well as "in" or "within" a certain period have been construed by courts to grant a prepayment privilege. *Id.* at 118–19 (citations omitted).[4] Under the "perfect tender in time" rule, the borrower is typically "required to pay the full principal, the accrued interest, and the unaccrued interest that would be due during the life of the note in order to discharge his contractual obligation to the [lender] on the unmatured note." *Id.* at 120.

▬▬ As the trial court recognized, the Note specifies that Son "shall pay" $12,500.00 "on the 1st day of April 2002, and every month thereafter until the indebtedness hereunder is fully paid." The Note contains no provision expressly authorizing prepayment. Moreover, it contains no language (such as requiring payment "on or before" a particular date, or "within" a particular period) that might take this case outside the general "perfect tender in time" rule. In these circumstances, Son was not entitled to prepay the debt and thereby terminate the accrual of the 6% interest specified in the Note, and Father was entitled to recover the full amount of the unpaid principal and interest to which the plain terms of the Note entitled him.[5]

▬▬ Although the trial court recognized that the Note contained no prepayment clause, it failed to award Father the full amount to which he was entitled under the "perfect tender in time" rule. At trial, Father's evidence calculated the amount

---

**4.** Son argues that *Skyles* only recognizes the "perfect tender in time" rule with respect to debts secured by residential mortgages. The Court's opinion, however, outlined broad principles applicable to promissory notes generally, recognizing that a residential mortgage is simply a promissory note secured by real estate. Indeed, *Skyles* notes that § 408.036, RSMo "restricts the application of the perfect tender in time rule to residential real estate mortgages," and thus residential mortgages are (at least in certain circumstances) *an exception* to the general rule. 789 S.W.2d at 120.

**5.** Citing *Evans v. Mo–Kan Teamsters Pension Fund,* 519 F.Supp. 9, 13 (W.D.Mo.1980), Son argues that Father "accepted prepayments from [Son] and, if there was not an express provision allowing prepayment in the contract, [Father] changed the terms through his course of dealing in accepting these prepayments." *Evans* itself recognized, however, that resort to the parties' post-contract dealings as an interpretive tool was only appropriate " '[w]here there is obscurity or ambiguity,' " *id.* (citation omitted), and found that "[i]n this case, ... ambiguity existed." *Id.* Son points to no ambiguity here. "Where the language of the contract is unambiguous, the intent of the parties will be ascertained from the language of the contract alone and not from extrinsic or parol evidence of intent." *Newco Atlas, Inc. v. Park Range Constr., Inc.,* 272 S.W.3d 886, 891 (Mo.App. W.D.2008). We note that Son does not argue that Father's actions waived his right to demand exact compliance with the Note's payment provisions, or created an estoppel.

Son owed on the Note in two different ways. Scenario # 1 (Plaintiff's Exhibit 8) assumed that Son made $12,500.00 monthly payments "on the 1st day of April 2002, and every month thereafter" as specified in the Note—*i.e.*, applying the "perfect tender in time" rule. Using Scenario # 1, the balance owing as of the time of trial was $145,639.81.

In contrast, Father's Scenario # 2 (Plaintiff's Exhibit 9) allowed Son to prepay, and gave Son immediate credit for the full amount of the payments Son made, when he made them. Scenario # 2 resulted in a balance owing of $97,242.58, the amount awarded in the judgment.

Although it recognized that the Note gave Son no right to prepay the debt, the trial court's judgment incorporates a damage figure (Father's Scenario # 2), which gives Son the benefit of a (non-existent) prepayment right. Because of this error, the judgment must be reversed to permit the trial court to recalculate the damages to which Father is entitled.

Son argues that, even if Father was entitled to damages under the "perfect tender in time" rule, he cannot seek such damages now, because the damages calculation Father submitted to the trial court in Father's Scenario # 1 erroneously compounded interest on the outstanding Note balance monthly, rather than the 6% interest "compounded annually" which the Note unambiguously specifies.[6] While Father's Scenario # 1 may not reflect an accurate interest calculation, Son did not object on this basis below, and his own calculations of the amount owing on the Note apparently compounded interest on the same basis. Father plainly preserved his contention that he was entitled to interest calculated under the "perfect tender in time" rule. Further, the trial court's judgment indicates that it accepted Father's evidence concerning the making and date of the Note, its original face amount, the amount of Son's payments, and the applicable interest rate. In these circumstances, determination of the correct, precise amount of interest owing on the Note is a mathematical calculation which the court can perform without taking further evidence.[7]

## III.

In his third Point, Son argues that the "trial court erred in its rulings that [Son] was in default [on the Note] and that [Father] was entitled to attorney's fees and expenses because … [Son] ha[d] actually paid more than the amount currently due on the Note, the original balance of the note was too high as a result of mutual mistake, and [Father] actually benefitted from, and was not damaged by, [Father]'s voluntary acceptance of these early and

---

6. Father argues that the monthly compounding of interest reflected in his Scenario # 1 worked to Son's benefit. We fail to see how this could be the case. The more frequently interest is compounded, and incorporated into a principal balance on which further interest accrues, the greater the indebtedness a borrower will have to repay.

7. *See, e.g., Brockman v. Soltysiak*, 49 S.W.3d 740, 746 (Mo.App. E.D.2001) ("the trial court has the power to compute and add interest owing on a contract [to a judgment], and … when the jury makes a mere computation error in calculating interest from dates over which there is no dispute, the trial court has the authority to correct that mistake"); *Bydalek v. Brines*, 29 S.W.3d 848, 857 (Mo.App. S.D.2000) ("[W]hen the only issues in a contract case are damages in the form of interest and attorney fees, the trial court may calculate those amounts and enter judgment accordingly. In such instance, a circuit court does not err in refusing to call a jury to calculate interest.… The rationale concerning interest is that if a contract calls for interest at a stated rate for a certain time, all that remains is a mathematical calculation." (citations omitted)).

excess payments." (Son does not challenge *the amount* of fees and expenses the trial court awarded.)

■ "In Missouri, litigants generally bear the expense of their own attorneys' fees as provided in the American Rule." *Lee v. Investors Title Co.*, 241 S.W.3d 366, 367 (Mo.App. E.D.2007). "Attorneys' fees may be recovered, however . . . pursuant to a contract. . . ." *Id.*

As noted at the outset, the Note provides in relevant part:

> In the event that [Son] fails to transmit to [Father], *any* of the installments which accrue and become payable throughout the amortization period, within fifteen (15) days of the date said payment is due, [Father] may without further notice declare this Promissory Note in default and, demand payment of the entire amount of the unpaid balance at that time. . . . In the event of default as set forth herein, [Son] agrees to pay any costs incurred by [Father] which are associated with the collection of this Promissory Note, including but not limited to, reasonable attorney's fees and expenses.

(Emphasis added.)

■ Under the plain language of the Note, Son was required to make $12,500.00 payments to Father *every* month until the entire sum of the Note was paid. Son does not dispute that he failed to faithfully execute this obligation. Under the Note's terms, in these circumstances Father was entitled to declare the Note in default and accelerate the entire indebtedness, which he did. *See, e.g., N. Star Apartments v. Goppert Bank & Trust Co.*, 657 S.W.2d 253, 256 (Mo.App. W.D.1983) (because an

"installment was not paid when due . . . [the borrowers] therefore were in default [and][a]t that point the holder of the note . . . was entitled to request payment in full of all remaining installments"). Son also unambiguously agreed to pay Father's attorneys fees and expenses in the event of such a default.

■ Although Son claims that his attorneys fee obligation should be ignored because he "often made payments in excess of $12,500.00," and "[Son] was actually ahead in the payment schedule when compared to a 'strict' amortization based on monthly payments of only $12,500.00 per month," the fact remains that the circumstances specified in the Note to trigger Son's attorneys fee obligation existed here. " 'If a contract provides for the payment of attorney's fees in the enforcement of a contract provision, the trial court must award them to the prevailing party.' " *White v. Marshall*, 83 S.W.3d 57, 63 (Mo. App. W.D.2002) (quoting *Howe v. ALD Servs., Inc.*, 941 S.W.2d 645, 652 (Mo.App. E.D.1997)). "The decision to award attorney's fees is not a matter of discretion in this situation and failure to do so is erroneous." *Lee*, 241 S.W.3d at 368. "Once the [court] found for [Father] on his breach of contract claim, he was entitled to attorney's fees as a matter of law." *Howe*, 941 S.W.2d at 652; *see also, e.g., Vaughn v. Willard*, 37 S.W.3d 413, 417 (Mo.App. S.D. 2001) (reversing trial court's failure to award party any attorneys fees, where it prevailed on claim for specific performance of a contract which contained an attorneys fee provision).[8] We accordingly deny Son's third Point, and affirm the circuit court's award of $12,500.00 in attorneys fees and expenses to Father.

---

8. Son cites *Building Erection Services Co. v. Plastic Sales & Manufacturing Co.*, 163 S.W.3d 472, 480–81 (Mo.App. W.D.2005), and *McDonald's Corp. v. Sandbothe*, 814 S.W.2d 665, 671 (Mo.App. E.D.1991), to support his

claim that the trial court retained discretion as to whether to award Father any fee. But both cases are distinguishable. In *Building Erection Services*, the party seeking fees had not prevailed on its contract-based claim.

Father has also filed a motion seeking an award of his attorneys fees on appeal. As we have noted, the Note obligates Son to reimburse Father, following a default, for any fees he incurs "which are associated with the collection of this Promissory Note." " 'Attorney fees may be awarded on appeal if they are based on a written agreement that is the subject of the issues presented in the appeal.' " *SE Co-Op Serv. Co. v. Hampton*, 263 S.W.3d 689, 696 (Mo.App. S.D.2008) (quoting *Am. Nat'l Ins. Co. v. Noble Commc'ns. Co.*, 936 S.W.2d 124, 134 (Mo.App. S.D.1996)). Given that the fees Father has incurred in this appeal are plainly "associated with the collection of" the Note, we grant Father's motion to recover his fees on appeal.[9] "However, because the trial court is in a much better position to hear evidence and argument on this issue and make a determination of the reasonableness of the requested fees and costs, we prefer, in this case, to defer our authority to the trial court." *SE Co-Op*, 263 S.W.3d at 696–97.

### Conclusion

The trial court's judgment is affirmed to the extent it found Son liable for breach of the Note, rejected his counterclaims, and awarded Father his attorneys fees for the

---

163 S.W.3d at 480 ("The circuit court did not award attorney's fees because BESCO failed to prevail on any of its contract claims."). *McDonald's Corp.* emphasized that the case before it involved a "lease and amendments ... [which] created an ambiguity which resulted in this declaratory judgment action being filed." 814 S.W.2d at 671. In any event, even if the trial court retained discretion with respect to Father's request for attorneys fees, Son has failed to show any abuse of that discretion in the circumstances here.

9. Son cites older Missouri cases which state that "[e]xpenditures incurred after judgment on a note providing for collection costs and attorneys' fees are not allowed because the cause of action on the note merges into the judgment." *Bank of Brookfield–Purdin, N.A.*

---

trial court proceedings. The court's damages award is reversed, and the case remanded for recalculation of Father's recoverable damages under the "perfect tender in time" rule discussed in this opinion. Father's motion for attorneys fees on appeal is granted, but the issue of the reasonableness of Father's requested fees is remanded for initial determination by the trial court.

All concur.

---

v. *Burns*, 724 S.W.2d 262, 265 (Mo.App. W.D. 1986) (citing *Commerce Bank of St. Louis, N.A. v. Wright*, 645 S.W.2d 17, 22 (Mo.App. E.D.1982), and *Citizens Bank of Windsor v. Landers*, 570 S.W.2d 756, 764 (Mo.App. 1978)). More recent cases plainly allow for the recovery of attorneys fees on appeal where authorized by contract, however. In addition to the cases cited in the text, *see, e.g., Christian Health Care of Springfield West Park, Inc. v. Little*, 145 S.W.3d 44, 56–57 (Mo.App. S.D.2004); *Rosehill Gardens, Inc. v. Luttrell*, 67 S.W.3d 641, 648 (Mo.App. W.D.2002). The fee provision here, authorizing recovery of any fees "which are associated with the collection of this Promissory Note," is clearly broad enough to comprehend Father's current request.